## SARAH J. LINDSEY et al., Appellants, v. MARY VIRGINIA STEPHENS et al.

### Division Two, June 30, 1910.

1. **WILL CONTEST: Incapacity.** The law presumes that a testator is of sound and disposing mind until there is evidence tending to overcome this presumption.

2. ——: ——: **Age: Physical Infirmity.** The jury are necessarily required to take into consideration the age of the testator, and the extreme illness with which he was suffering when the will was made, in determining his capacity to make a will; but extreme age and extreme illness do not of themselves constitute incapacity. The law looks to the capacity of the mind. If a testator had sufficient understanding and intelligence to know the extent of his property, the persons who were the natural objects of his bounty, the business he was about, and the manner in which he wished to dispose of his property, he had sufficient capacity to make a will..

3. ——: ——: Case for Jury. The testator was eighty-two
years old, and for two weeks had suffered with pneumonia, and
his left arm was paralyzed, due to old age. His will was writ-
ten at two o'clock in the afternoon of the day before he died,
and his physician testified that at nine or ten o'clock of that
day he was perfectly rational. There was testimony that he
was strong intellectually, and that at the time the will was writ-
ten he was of sound mind; his wife, from information she received
from the physician as to his condition, sent for three neighbors,
and when one of them arrived his daughter told him her father
wanted him to write something. He went in the room and tes-
tator told him someone would soon be there from town that
could write a good hand, and the friend told him that if he
wanted anything written he would do it for him. Testator then
called for a form book, and the friend told him he did not need
one. Testator then asked his wife and daughter to get a will
he had executed nine years previously, and he asked the
daughter to read that over to him, and she did, and the friend
read it to him also, one clause at a time. The friend then
asked him if he wanted his will written in that way, and he
said he did except that he wished to give his children by his
first wife twenty dollars each instead of five each, and that
he wished the names of two children of his second wife, who
had died, omitted from the will. The will was then written as
directed, and read over to him clause by clause, and he at-
tempted to sign it, but could not, and he asked the scrivener to
sign his name to it, which was done, and he was held up and
his hand held by the scrivener while he made his mark, and the
other two friends, who had witnessed the first will, signed it
as witnesses in his presence. Members of his family testified
that he was perfecty rational and expressed his approval of
each clause of the will as it was read to him. There also was
testimony that for two days he had at times been flighty, had
thought his son-in-law was a hired hand, had supposed the bed
clothing to be hands of tobacco, and directed the tobacco to be
taken away. *Held*, there was ample evidence to support the
verdict of the jury sustaining the will.

4. ——: ——: Law Case: Practice. The contest of a will is
a civil case, and it is not the province of the court to inter-
fere with the verdict of a jury upholding the will where there is
substantial evidence of testator's capacity, and the issue has been
submitted by correct instructions.

5. ——: Attestation: At Request of Testator. Where testator
sent for the two subscribing witnesses for the very purpose
of having them attest his will, and when one of them came re-
marked to him that he had witnessed his former will and he

would have to call upon him again for a like favor; and while the other testified he could not recall any specific request of testator to witness it, yet that he was in the room and saw him try to sign it, and failing in ability to do so, heard him request the scrivener to write his name and then saw him held up while he made his mark, their signing as witnesses in his presence was sufficient attestation.

6. ————: **Former Will as Evidence.** A former will, differing in no respect from the will in contest except to omit some devisees who had died since its execution and to change the amount of some special legacies, is competent evidence as bearing on the question of the testator's mental condition and the state of his affections—especially where, at the time the will in contest was written, testator himself called for the former will and had it read to him.

7. ————: **Undue Influence.** Where it is extremely doubtful whether there was sufficient evidence upon which to submit to the jury the issue of undue influence, yet where it was submitted by correct instructions, and the jury by their verdict upholding the will found there was no undue influence, contestants cannot complain.

Appeal from Platte Circuit Court.—*Hon. Alonzo D. Burnes*, Judge.

AFFIRMED.

*James H. Hull* and *Ardey Gabbert* for appellants.

(1) The burden was upon the proponents to establish the due execution of the will. This fact was put in issue by the petition. They must also establish the sanity of the testator in order to make a prima-facie case. They failed to do this and there was nothing for the jury to pass upon. There was no will. Harris v. Hays, 53 Mo. 96. This writing was not signed by William Stephens, was not written by him, was not signed by anyone by his direction, and was not signed at all. Such an instrument is not in any sense a will. Catlett v. Catlett, 55 Mo. 342; Hospital Assn. v. Williams, 21 Mo. 17; Northcutt v. Northcutt, 20 Mo. 266. The execution of this will is in conflict with Sec.

4604, R. S. 1899, even as to the signature. (2) He had not mental capacity to make a will, because he did not comprehend and was not capable of comprehending, at the time this writing was executed, the nature and kind of his property, what property he had, and the persons who reasonably came within the range of his bounty. He had not sufficient intelligence to understand his ordinary business, and he did not know what disposition he was making of his property. These four requisites were necessary; and if he was wanting as to one of them, he could not make a valid will. Riggin v. Westminster College, 160 Mo. 579; Holton v. Cochran, 208 Mo. 410. (3) He never understood his ordinary business, because it was stated in the will that he had provided for his older children when he had not done so. This was both mental incapacity and a delusion. It nowhere appears in the record of the case that he had aided his older children to such an extent as he was aiding the younger ones. The exact opposite is true and he was under a delusion in the matter. He had long been under the delusion that he had advanced to his older children more than he could give to the younger ones, and this is stated in the pretended will. This must have controlled him, if he had mind enough to be controlled, in making the will. It was not true. It was a very extravagant delusion. Benoist v. Murrain, 58 Mo. 307; Holton v. Cochran, supra; Crossan v. Crossan, 169 Mo. 439; Archambault v. Blanchard, 198 Mo. 384; Sayre v. Trustees, 192 Mo. 95. (4) His delusion was aided and kept agitated by his last wife, Mary Virginia, whose testimony shows throughout that she was constantly telling him that his older children would break his will if he disinherited them. Her influence seems to have been wielded, though cunningly, for a great number of years. She says he was a strong character, and a man who wanted his way. Her tactics were, therefore, to instill the subtle poison, by cunning

and fraud, which caused him to state in his pretended will, against the truth and the facts, that he had made the advancements to his older children. Her fraud is further shown by the fact that she kept his older children out of the room when the will farce was being enacted. She had taken pains for years to keep his older children from coming to visit him. When he met them, he did so at their homes, not at his own. Holton v. Cochran, 208 Mo. 421. (5) The evidence shows that he had not sufficient understanding to comprehend the nature of the business he was engaged in, the nature and extent of his property, and to whom he desired to give it, "without the aid of another person." He was aided and controlled by Nora Pharis, Mr. Thorp, and the old will. Holton v. Cochran, 208 Mo. 423.

*Anderson & Carmack* and *Chas. H. Hillix* for respondents.

(1) There was no substantial evidence in this case of mental incompetency. There were no facts established from which the jury might have drawn, reasonably, any legitimate inference tending even to sustain such an issue. The jury found a most righteous verdict for the will, under the instructions of the court, and the judgment is absolutely impervious to legal assault. Hamon v. Hamon, 180 Mo. 685. (2) Appellant's counsel seem to attach some force to the idea "that the execution of the will is in conflict with Sec. 4604, R. S. 1889, even as to the signature," but fail to state the facts from which such an inference is drawn. But, if the shadow of a doubt existed, the decisions of the Supreme Court in Hughes v. Rader, 183 Mo. 630, and in Schierbaum v. Schemme, 157 Mo. 1, would dissipate it. (3) The law presumes that a testator was possessed of a sound and disposing mind, and it rests upon him who disputes the validity of a

will to overcome this presumption by persuasive evidence. Jackson v. Hardin, 83 Mo. 186. (4) By competency in a testator is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons he makes the beneficiaries of his bounty. If he has sufficient intelligence to fulfill this definition, imperfect memory caused by sickness or old age, forgetfulness of names of persons he has known, idle questions, physical suffering, will not be sufficient to establish his incompetency. Van Alst v. Hunter, 5 Johns. Ch. 248; Eddy's Appeal, 109 Pa. St. 406; Guild v. Hull, 127 Ill. 523. Cornwell v. Riker, 2 Dom. 366. (5) The former will was competent evidence. Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo. 170; Von De Veld v. Judy, 143 Mo. 348.

GANTT, P. J.—This is an action to contest the will of William Stephens of Platte county, Missouri. The plaintiffs, Mrs. Lindsey and Daniel P. Stephens, are two of the children of William L. Stephens. The defendants are his widow, Mrs. Mary Virginia Stephens, and her four children by Mr. Stephens, and a son, Louis N. Stephens, his child by his first marriage.

On the 21st of January, 1906, William L. Stephens executed the will which forms the basis of this suit. By this will he gave to his three oldest children, Louis N. Stephens, Sarah J. Lindsey, the wife of Walter T. Lindsey, and Daniel P. Stephens, twenty dollars each, and all the residue of his estate, both personal and real, he gave to his widow, Mary Virginia, for and during her natural life, and at her death to be equally divided between his four youngest children, of whom she was the mother, and he appointed Louis N. Stephens and his widow his executors without bond. The will was contested on two grounds: first, that William L. Stephens was not of sound and disposing mind and memory and by reason of old age and sickness he was

incapable of making a testamentary disposition of his property; and, second, on the ground of undue influence exerted by his wife, Mrs. Mary Virginia Stephens, by which he was prejudiced against his other heirs at law and was caused to make his will in behalf of her and her four children to the main portion of his estate. The cause was tried at the August term, 1906, and resulted in a verdict sustaining the will. From the judgment on that verdict the plaintiffs have appealed to this court.

The facts developed on the trial were substantially as follows:

At the time of the testator's death on the 21st of January, 1906, he was eighty-two years old. He had been twice married. By his first wife he had four children, three of whom survived him. He married a second time in 1880, and there were five children of this second marriage, one of whom had died before her father. At the time of his death he was the owner of eighty acres of land in Platte county and a small amount of personalty. Three of the children of the last marriage were minors when their father died. He had been sick about two weeks with pneumonia. His physician testified that he had pneumonia in both lungs, the lower lobe of his right lung and the whole left lung was solidified. He was partially paralyzed, his left arm was paralyzed. This paralysis the doctor attributed to old age. He saw him on the day before he died and he said his vitality was failing rapidly. From the other testimony in the case, it appears that the testator's wife, from the information she received from the doctor as to her husband's condition, sent for two friends of her husband, at his request, Judge Thorp and Mr. Vermillion. Judge Thorp testified he was acquainted with William L. Stephens in his lifetime. On the 21st of January, 1906, he was at the home of Mr. Stephens. Mrs. Lindsey, his daughter, told him that her father wanted him to

write something and for him to go into the room. Mr. Stephens told him that someone would be there soon from town that could write a good hand, and witness remarked to him that if he wanted any thing written he would do it for him. He asked for a form book that he had, but the witness told him that was not necessary. He then requested his wife and daughter to get an old will and that was brought to him; he then had this old will read over to him, and said he wanted to make some changes in it: that he wanted to give his older children more · than he gave them in that will; that he would like to give them more than that, but he was not able to do so; that he had given them more already than he was able to give the others. He said he had given them five dollars each in the other will and he wanted to make it twenty dollars. He told the witness to read the old will over to him and he read it to him one clause at a time. His daughter, Mrs. Pharis, read it to him the first time. The witness then asked him if he desired it written in that way and he said that he did. Witness then wrote the will one clause at a time and as he would write each clause he would ask if he wanted it that way, and he said that he did. There were two clauses in the will, which, at the witness's suggestion, he did not recopy. The clause that he omitted was the one in which he requested his wife, in case that she and his two youngest boys should live, to strive to give them an education, but not to sell land for that purpose. The only other change in the will of any importance was the omission from the list of his legatees of Edwin Price, a son, and Pauline Alexander, a daughter, both of whom had died since the making of the first will. After the will was completed, Judge Thorp read it over to him and asked him if that was the way he wanted it and he said it was. After the will was written, he sent for the witnesses to come into the room, Mr. Robbins and Mr. Vermillion, and then he attempted to sign the will, but

he was too weak to do so. He scribbled on the paper, but could not write, and thereupon he asked Judge Thorp to sign his name for him, and then he put his mark on the will and the name was written by Judge Thorp. In regard to the attestation, Judge Thorp testified the signatures of the two subscribing witnesses were written on the will in his presence at the request of Mr. Stephens. "Mr. Robbins came in and Mr. Stephens said, 'I am glad to see you. I want to call on you again,' and remarked that Mr. Robbins was a witness to the other will." Mr. Robbins and Mr. Vermillion then signed the will in the presence of Mr. Stephens and in the presence of each other. Mr. Robbins has since died. Mr. Stephens was at that time very weak physically, but his mind seemed to be clear. On cross-examination he stated the testator was very weak and emaciated, he had been sick about two weeks, his body was very weak. He could not talk out strong. This will was written on the Sunday following the day it purports to be written, it was written about two o'clock in the evening of January 21st, but the date is the 20th. He died the next morning after the will was written. Judge Thorp testified that he raised Mr. Stephens up in the bed and told him to write his name; he did not write it, but he undertook to do so, however. We had to lay him down, he was exhausted from being held up. "I wrote his name to the will and he made his mark with my assistance." "I had to assist him to make his mark." At that time he did not say what land or notes he owned and did not call over the names of each and every one of his children. Instead of doing so he told Judge Thorp to read over the old will and Judge Thorp and Mrs. Pharis read it over first, then he told Thorp what changes he wanted made in it and had it read over clause by clause. His breathing was bad and hard and he got extremely weak. He did not seem to have the use of his hand. He was partially paralyzed. He was eighty-two years old. There

are some erasures in the certificate made by the witnesses. Judge Thorp testified that he did not get it copied right the first time. He said he was not afraid the testator would die, but he was very weak and it was worrying him very much. The erasures do not appear in any part of the will proper. The witness testified that he dated it on the 20th for fear if he dated it on Sunday it would invalidate the will.

Mr. Vermillion, one of the subscribing witnesses, testified that he knew Mr. Stephens in his lifetime, and signed the document drawn up as his will on January 21, 1906. He did not remember what Mr. Stephens said about the instrument, but he understood that it was his desire that he should witness it. He testified that was his signature to the will and the other was that of Mr. Robbins. They signed it in the presence of each other. Mr. Stephens was asked to sign the paper and they held the paper up for him, but he could not sign it. He had great trouble in breathing when this will was written. He seemed to know what he wanted when he spoke to the person waiting on him. Mr. Thorp had just finished reading the will to Mr. Stephens. When he went into the room Mr. Stephens seemed to acknowledge the will. "I thought he was dying, he never asked me directly to sign the instrument." He did not think Mr. Stephens understood the nature of the transaction he was engaged in or the extent of his bounty or the object of his bounty. When the question would be asked him if that was satisfactory, or shall I do this, he would nod his head. Mr. Thorp asked him to sign the will in the presence of Squire Stephens. He asked Mr. Stephens if that was satisfactory and he nodded his head.

Mrs. Pharis, a daughter of the testator, corroborated the testimony of Judge Thorp in all respects as to what occurred as to the request of her father to Mr. Thorp to write the will and of her procuring the

old will and the reading of it over to him and his direction to Judge Thorp to write the new will as the old one. He directed the changes he wanted made. Mr. Thorp wrote and read it over to him a clause at a time. Her father was very sick and very weak at the time.

Dr. Schultz testified that he called on Mr. Stephens on Sunday, January 21, 1906, the day of the execution of the will, between nine and ten o'clock in the forenoon and his mental condition was good at that time. He did not see him after that time before his death. Other witnesses testified that while the testator was very weak at the time he signed the will his mind was clear and he was conscious of what he was doing.

The old will was admitted in evidence by the court as going to the question of the testator's mental condition and for no other purpose, for the reason that the other witnesses had testified that this old will was read to the testator at the time of the execution of the last will. To the admission of this old will the plaintiffs at the time objected and excepted. The inventory and appraisement of Mr. Stephens's estate was offered and admitted in evidence over the objection of the plaintiffs but neither party has incorporated these documents in their abstract of the record.

On the part of the plaintiffs, Mrs. Lindsey, one of the plaintiffs, testified that she went to see her father at eleven o'clock on Sunday before he died on the next Monday. He was in great pain, very nervous and restless. He did not have mind enough to hold any conversation with any one. The will was written about two o'clock Sunday afternoon. Mr. Thorp took his hand and made the mark to the will, then they laid him down and he said nothing, only, "Lay me down." He said, "Take the tobacco off of the bed," and he thought he was talking to the hired man, named Cox. Just once in a while he knew us.

Mr. W. T. Lindsey, the husband of Mrs. Sarah Lindsey, testified that the testator did not know his daughter when she came into the room. On the previous Saturday night the testator called him Bud and Frank and all those names. He heard him call Mr. Cox to take the tobacco away. He talked about the covers and handled them like they were tobacco. Mr. Thorp copied the old will; Mr. Stephens never gave any directions to Mr. Thorp about the writing of that instrument. Mr. Thorp put the pen in his fingers and brought his fingers around and made a scratch. Witness thought he would die when they laid him down. Mr. Thorp asked the witnesses to sign the will. Witness never heard that Mr. Stephens requested them to sign it. From the time he went there on Friday part of the time he knew witness and part of the time he did not. He died on Monday. Witness was in the room when they wrote the will. After they laid him down he could not ask anybody anything. Part of the time he answered and part of the time he did not.

Louis N. Stephens, one of the executors named in the will, testified that his father got worse about noon on Friday. He did not see his father sign the will. He saw Mr. Thorp writing on a stand close by the bed. He did not hear any one ask the witnesses to sign the will. He was excited. I think he knew what he was doing. He testified that his father and mother gave him eighty acres of Kansas land, worth $350, a horse and a cow. His father had eighty acres of land when he died. It was worth sixty dollars per acre.

Daniel Stephens, another son, testified that he was there on Friday a few hours only. In the evening his father got out of his head and talked about tobacco. He was a little weaker on Saturday. He asked him to have a chair. "I do not know whether he was talking about tobacco that day or not." He was out of his head when he talked about tobacco. Witness was not there on Sunday. All that his father ever

gave him was a horse and cow; never gave him any land.

Mrs. M. E. Stephens testified to the extreme debility of the testator at the time the will was made and of his inability to sign the will. She said that Mr. Thorp did the writing and Mrs. Pharis did the reading to him.

In rebuttal C. C. Graves testified on behalf of the defendant that Mr. Stephens always recognized him even up to ten minutes before he died. He was too sick to talk much, but he always recognized him. He was a strong man intellectually.

Mrs. Louis Simmons testified that she was the stepdaughter of William L. Stephens, and she was at the home of Mr. Stephens from the time he was taken sick until he died. She was there when his last will was written by Mr. Thorp; she was in and out of the room during all the time; that Mr. Stephens knew what he was doing and knew the time he was to take his medicine and everything. His mind was sound and he knew every thing that was said.

Mrs. Mary Virginia Stephens, the widow, testified and fully corroborated the statements of Judge Thorp and Mrs. Pharis as to what occurred in the sick room at the time the will was drawn and witnessed. Her testimony denies the exercise of any influence whatever over her husband as to the disposition of his property and the execution of his will. This is sufficient statement of the facts.

I. It is insisted by the plaintiffs that the burden was upon the proponents to establish the due execution of the will and that they have utterly failed to do so, and there was no will. They insist that the testator had not mental capacity to make a will and was not capable of comprehending and did not comprehend at the time the will was written the nature and kind of his property and the persons who reasonably would

come within the range of his bounty.   They insist
that the testator did not know the difference between
the bed clothes and a hand of tobacco.   And that he
mistook his son-in-law, Wat Lindsey, for his farm
hand, Frank Cox, and that he was laboring under a
delusion as to the provision he had made for his older
children.   While there was evidence from one or two
of the witnesses that at times the testator was flighty
and that he spoke about the tobacco and one or two of
the witnesses testified that he mistook his son-in-law for
his hired man, on the contrary, Dr. Schultz, his attend-
ing physician, testified that as late as nine or ten
o'clock on the morning of the day on which the will
was written at two o'clock in the afternoon, the testa-
tor was perfectly rational, and the other witnesses,
Judge Thorp and the members of the family, all testified
that he was perfectly rational, and in addition to their
estimate of his mental condition they testified to the
fact that the testator, after learning of his critical
condition, sent for two of his old neighbors and
friends, Mr. Robbins and Mr. Vermillion, and Judge
Thorp; that when they arrived at his home that day
he said to Judge Thorp that he had sent for someone
who could write a good hand, and thereupon Judge
Thorp tendered him his services to do any writing
which he might desire.   He then directed his daughter
to get his book which contained a form of a will, but
Judge Thorp told him he could write a will without
that form; he then directed his daughter specifically
where to find an old will that he had prepared in 1897,
and then directed Judge Thorp to prepare a will con-
taining the same provisions in that will except that
he desired the names of two of his children who had
died since the execution of the old will omitted from
the new one, and also expressed a desire to change
the provision that he had made in his former will for
his older children by his first wife.   He then requested
his daughter, Mrs. Pharis, to read the old will over to

him, and at his direction Judge.Thorp wrote the new will clause by clause, reading over each clause to him as he wrote it, and he assented and expressed his approval of each clause as Judge Thorp had written it.

The law presumes that a testator is of a sound and disposing mind until there is evidence tending to overcome this presumption. [Jackson v. Hardin, 83 Mo. 175.] While, of course, the jury were necessarily required to take into consideration the age of the testator, who was then a man eighty-two years old, and the extreme illness with which he was then suffering, these facts of themselves did not constitute him incapable of making a will. The law looks to the capacity of the mind, and if a testator had sufficient understanding and intelligence to know or understand the extent of his property and the persons who were the natural objects of his bounty, and to know the business that he was about and the manner in which he wished to dispose of his property, it was sufficient, and so the circuit court correctly instructed the jury. The jury had before them all the witnesses, and the testimony of the attending physician that the testator was perfectly rational up to nine or ten o'clock of the day on which he executed the will at two o'clock that afternoon, and the testimony of Judge Thorp and other members of the family, and it was their province to believe their testimony, and if they did, unquestionably the testator knew not only what he was about, but had in mind all of his children, not only those living, but those who had died, and knew that he was making a disposition of his property.

When it is considered that he had only eighty acres of land on which he was residing and a small amount of personal property, it certainly was not a difficult matter for him to have his property in mind. The contest of a will is a civil case, and where, as in this case, the capacity of a testator to make the will in question was submitted to the jury under correct

instructions, it is not the province of this court to in-
terfere with their verdict.   The mere fact that the tes-
tator at times was flighty does not outweigh all the
other evidence in the case—his recognition of his neigh-
bors when they came to see him up to the very last; his
recalling the fact that Mr. Robbins, one of the sub-
scribing witnesses, had also witnessed his former will,
made nearly ten years before that time; his ability to
direct his daughter exactly where to find his old will
and his direction to Judge Thorp to make practically
the same disposition of his property as was contained
in his old will; his requiring the old will to be read
over to him, clause by clause—all certainly indicating
a sufficient capacity to make a will, if the jury believed
the witnesses who detailed these facts.   Clearly the
jury must have believed them or their verdict would
have been otherwise.   We are clear that this court
has no authority to adjudge that there was no sufficient
and substantial evidence that the testator had suffi-
cient capacity to make the will.

We might add that the very changes which the tes-
tator desired to make in his former will themselves
demonstrate the clearness of his conception of the
change in the conditions from the time he made his
first will some ten years before that time.   During
that time two of his children had died and he remem-
bered that he had given only five dollars to his first
children in the first will and he desired to increase that
in this will.

II.   Counsel for the plaintiffs also assail the exe-
cution of the will on the ground that he himself did
not request the witnesses to sign and attest the same,
but here again they are confronted with the testimony
that he had sent for Mr. Robbins and Mr. Vermillion
for this very purpose and when Mr. Robbins came
into the room and shook hands with him, he remarked
to him that he had witnessed his first will, and he

would have to call upon him again for a similar kindly office. Surely no stronger proof has ever been required by any court to show a request by a testator than this to these two witnesses to sign his will. And while Mr. Vermillion could not recall a specific request by Mr. Stephens to him to sign as a subscribing witness, Judge Thorp testified that he requested Mr. Vermillion in the presence of Mr. Stephens to sign the will as a witness, and asked Mr. Stephens if that was right and Mr. Stephens expressed his assent thereto. As was said in Hughes v. Rader, 183 Mo. l. c. 700, "These witnesses were there for the purpose of attesting Mrs. Rader's will; the will was written by Bruce Rader in their presence; they were all together in a comparatively small room; Mr. George heard Mrs. Rader say she wanted the will written, and says it was written, read over to her, and she was raised up in bed to affix her signature. . . . This was all done and said in the presence of both witnesses. They attested the will in the same room in the presence of the testatrix, identify their signatures to the attestation. . . . The mere fact that Bruce requested the presence of the witnesses, or that Mrs. Rader did not proclaim the instrument as her last will and testament and verbally request the witnesses to attest it, is not sufficient to annul the instrument on the ground of noncompliance with the statute. Actions sometimes speak louder than words, and no impartial mind can view the acts and conduct of all the parties in the room where this will was executed, together with all the conditions and circumstances surrounding the execution of this instrument, and reach any other conclusion than that the testatrix signed this will and that it was properly attested by the subscribing witnesses." In Schierbaum v. Schemme, 157 Mo. 1, VALLIANT, J., speaking for this court, said: "It is suggested that it does not show that the witnesses subscribed it at the request of the testator. The whole conduct, however,

was a sufficient request. The paper itself purported
to be the will of Henry Schemme, it had been read in
the presence and hearing of all, and when he said that
it was right it was equivalent to a formal proclama-
tion that it was his will, and when he signed it and
passed it at the table to the witnesses who signed it in
his presence, his act constituted a request that they
sign it; it could mean nothing else and was as signifi-
cant to that effect as if it had been put in formal
words.'' So here, in view of the fact that these wit-
nesses had been summoned to attest this will at the re-
quest of the testator himself; that they were there in
the room in his presence and saw him endeavor to
affix his signature to it, and failing, saw Judge Thorp
write his name for him, and then in his presence affixed
their names as subscribing witnesses thereto, we think
that there was a sufficient formal execution of the will
to comply with the requirements of the statutes.

III.   It is insisted that the circuit court erred in
admitting the former will in evidence. It will be re-
membered that the learned circuit court admitted this
former will solely for the purpose of showing the men-
tal condition of the testator and the state of his affec-
tion. But not as evidence of the fact stated in that
will. It is significant that the testator himself called
for this old will without any suggestion from any
member of his family or from the scrivener who was
to write the will. The changes in that were few and
simple. Two of the children had died and their names
were omitted in the last will, a change was made sim-
ply in the amount of the bequests to the older children,
and at the suggestion of Judge Thorp he omitted the
useless grant of power to his executors to sell his real
estate for the purpose of paying his debts. With these
small changes the last will was a practical copy of the
first and tended to show that his affection remained at
the last just as it was ten years before when he exe-

cuted the first will. But this question has been set at rest in this jurisdiction by this court in Thompson v. Ish, 99 Mo. 1. c. 171. In that case BLACK, J., says: "Nor did the court err in allowing the witness Rathbun to testify as to the contents of the will of April, 1882. That will, it is true, had been revoked by the execution of the new and the destruction of the old one. The evidence was not, however, offered for the purpose of establishing it as the will of Mrs. Ish. It was offered for the purpose of showing her fixed purpose and intention at that date. . . . By both wills she gave the bulk of the property to James, and they are substantially the same. If, as we have seen, the declarations of the testator are admissible when the issues are want of testamentary capacity and undue influence, then it must be competent to put in evidence, for like purpose, this former will. It tends to show that for a year before making the will in question, she had formed the purpose of giving the bulk of her property to the defendant. The fact that she had formed that purpose at that date tends to show that the present will was not the result of undue influence, exercised by defendant in her last sickness, and when she had become weaker in body and probably in mind. Says Redfield: 'Evidence of former wills and of other pecuniary arrangements for the wife is also admissible, as having a bearing upon the question whether the testator has understandingly and of his own free will changed his settled views.'" [1 Redf. on Wills (4 Ed.), 538; Jones v. Thomas, 218 Mo. 1. c. 543; Von De Veld v. Judy, 143 Mo. 348.]

IV. On the issue of undue influence, the court instructed the jury that it devolved upon the plaintiff to prove the undue influence alleged in the petition, but that it was not necessary that it should be proven by direct evidence but might be inferred from all the facts and circumstances in the case if they were of sufficient

probative force to induce the jury to believe that the will in controversy was procured by the undue influence of Mary V. Stephens; that by undue influence is meant such influence as amounts to force, coercion or over persuasion which destroys the free agency and will power of the testator; that it must not be merely the influence of affection or attachment nor the desire of gratifying the wishes of one beloved, respected and trusted by the testator.

These instructions were in harmony with instructions on the same subject requested by the plaintiffs and given by the court and properly declare the law of the case. While the court submitted this question to the jury and the jury found there was no undue influence, it is extremely doubtful whether there was sufficient evidence upon which to submit such an issue to the jury. But of course, the plaintiffs are in no position whatever to complain on this ground. We have been unable to find any error in the admission of the testimony or the instructions of the court. The cause was well tried and submitted to a jury of the county in which all the parties reside and as already said there was ample evidence to sustain the verdict of the jury if they believed it, and such being the case their verdict should not and will not be disturbed. The judgment is affirmed. *Burgess* and *Fox, JJ.*, concur.