## Morris *v*. Collins.

### Opinion delivered January 22, 1917.

1. WILLS—PROOF OF MENTAL CAPACITY.—To enable the jury to determine the testator's capacity to make a will, a wide range of inquiry is permissible into facts and circumstances, both before and after the time of making the will.

2. WILLS—MENTAL CAPACITY—INSTRUCTION—"REASON."—An instruction that "if you find from the evidence and the circumstances of the case that the testatrix, at the time of signing the will, was unable to make a disposition of her property for the want of understanding and *reason*, the said will is invalid and must be rejected;" *held*, not improper, and while the word *reason* was unnecessary, that when considered in the connection in which it was used, that it could not have misled or confused the jury.

3. APPEAL AND ERROR—INSTRUCTIONS—MISLEADING WORDS—SPECIFIC OBJECTION.—Where appellant objects to a word used in an instruction given at appellee's request, it is his duty to ask the court specifically to explain these words or else to strike them from the instruction.

4.  WILLS—UNDUE INFLUENCE.—Undue influence, such as to invalidate
    a will, is such influence as results from fear, coercion or other cause
    that deprives the testator of his free agency in the disposition of his
    property.

5.  APPEAL AND ERROR—IMPROPER INSTRUCTION—WAIVER OF OBJECTION.
    —The granting of a correct prayer for instruction on behalf of appel-
    lant, held to constitute a waiver of his objection to an incorrect in-
    struction on the same issue given at the request of the appellee.

6.  WILLS—FRAUD AND UNDUE INFLUENCE.—Fraud and undue influence
    may be established by circumstantial evidence, and it is necessary
    that there be proof of facts and circumstances justifying an inference
    of fraud and undue influence, before the jury will be authorized to
    find that there was such fraud and undue influence.

7.  WILLS—UNDUE INFLUENCE.—A testatrix, an old negro woman, by
    will left all her property, except a small sum of money to certain
    members of her family, to a white man—a wealthy planter. The will
    was contested, and held, the finding of the jury that the will was in-
    duced by the undue influence of the principal devisee, and that the
    same was invalid, was supported by the evidence.

Appeal from Pulaski Circuit Court, Second Divis-
ion; *Guy Fulk*, Judge; affirmed.

STATEMENT BY THE COURT.

Elmyra Gatlin, an aged negress, on March 12,
1910, executed her will, in which she gave to her two
nieces, Myrohn Morris and Sarah Pyburn, and a
nephew, Frank Collins, the sum of $50.00 each, and
her household goods to be divided equally between
them. She provided for the payment of her debts and
funeral expenses.

The third clause of the will is as follows: "I give,
bequeath and devise all the residue of my estate to
W. N. Morris, of Keo, Ark." The fourth clause reads:
"I appoint W. N. Morris executor of this my last
will."

At the time the will was executed she owned forty
acres of land and two head of horses. Some months
later she borrowed of the Colonial Mortgage Company
the sum of $500.00 and executed a mortgage on the
land to secure the same. She turned the horses and a
part of the money over to appellant. About three
years after executing the will Elmyra Gatlin died. The

appellant filed the will for probate, and appellees contested the will, charging that the testatrix did not have sufficient mental capacity to make the same, and that appellant exercised undue influence over her.

The will was admitted to probate, and on appeal to the circuit court the issues as to whether or not the testatrix had mental capacity to make the will, and as to whether appellant exercised undue influence over her in causing the will to be executed, were submitted to the jury, and the jury found against the will.

Judgment was rendered declaring the will void, and appellant seeks by this appeal to reverse that judgment.

*Miles & Wade*, for appellant.

1. There is no evidence to support the verdict. (1) The will is not an unnatural one; (2) it was not procured by undue influence; (3) the testatrix was sane; (4) the relations existing make the will a natural one. The verdict should have been set aside. 49 Ark. 367; 87 *Id.* 148; 93 *Id.* 66; 94 *Id.* 176. The burden was on appellees to prove lack of testamentary capacity. They failed. 40 Cyc. 1011-12. Evidence of sanity is abundant.

2. It was error to admit statements of testatrix that she wanted Frank Collins to have part of her estate. 60 Ark. 301; 40 Cyc. 1312, note 12.

3. The court erred in its instructions. 40 Cyc. 1007; 38 Mich. 238; 230 Ill. 572; 227 *Id.* 183; 132 *Id.* 385; 75 Fed. 480; 153 Mo. 223; 157 Cal. 301; 81 Col. 167; 99 Ark. 45; 99 *Id.* 45; 110 *Id.* 354; 100 *Id.* 316; 100 *Id.* 316; 88 *Id.* 7; 93 *Id.* 548; 49 *Id.* 448. There was no sufficient evidence of insanity, undue influence, fraud, etc.

Cases *supra*. They do not declare the law as to testamentary capacity, influence, dominion, mental faculties, discretion, mental ability, undue persuasion or advice or entreaty, fraud, artifice, etc. *Supra*. The appellees' instructions are fatally defective; they invade the province of the jury; submit foreign issues

and authorize the jury to find against the will, if any under influence "by any means" is shown, etc.

*W. C. Adamson*, for appellees.

1. The evidence is sufficient. The will is an unnatural one. There was undue influence. The testatrix was not of sound mind. She lacked mental capacity. 29 Ark. 156.

2. No incompetent testimony was admitted. Her declarations were admissible. 74 Ark. 212.

3. There is no error in the instructions. 19 Ark. 556; 40 Cyc. 1153; 29 Ark. 156; 40 Cyc. 1164; 28 Col. 167; 72 Wisc. 22; 72 Md. 300; 153 Mo. 223. Undue influence is a species of fraud. Reading all the instructions together there is no error. 93 Ark. 590; *Ib.* 564. The case on the whole was properly submitted to the jury and the verdict should not be disturbed.

WOOD, J. (after stating the facts). Appellant contends that the evidence was not sufficient to sustain the verdict.

One of the witnesses, a brother-in-law to the testatrix, and who lived in the same neighborhood, and who had known her for many years, testified in part as follows: "I have noticed her very frequently about four or five years before she died. Why, she would have peculiar ways. She would be talking to herself, and sometimes would be sitting while she was in your company talking, and she would be sitting with her head off from her like she had done forgotten there was anybody in the house but herself, and be wringing her hands and going on like that, and sometimes she would turn around and say: 'Where is my baby?' She would have her pipe in her mouth and ask for her pipe." The witness further detailed, at some length, the peculiarities of Elmyra Gatlin. He stated that at one time she went to the cow pump to milk, and went to open the gate and put her hand up on the post and a pain struck her in the hand and she lost the use of her hand. She said that something that they put on the post told her that she had a hoodoo,

and sometime after that she said that there was something put in the back of her chimney, and that consequently she suffered a great deal from that. She stated that she had gone to Little Rock and found a lady who understood such things and had carried her down to her home and that the lady cut it right out of the back of her chimney. She stated that she suffered awful misery in her head continuously, and her back was apparently broken in two; that she suffered awful with it on account of the hoodoo. She was very nervous and excitable. She would be talking and all of a sudden break off and go to crying.

Witness further stated that she would be sitting down and someone would speak and she would jump up and say to them, "What are you doing making all that fuss?" She seemed to be frightened over the least little noise.

Another witness, a sister of the testatrix, stated that during the last few years of her sister's life she seemed like she was losing her mind. She would just get down on her knees and groan about her head. She would put her hands on her head and groan, and witness would sit in the room all night with her. She stated that the doctor said that she was going into Bright's disease; had caught it from Sylvia, her sister, who died of Bright's disease. She would complain about suffering a great deal with her back and head. She stated that she suffered so bad with her mind that she had no mind. At one time witness had a conversation with her when she was going on so, saying that she was crazy. Witness told her that she had land and stock and was doing better than witness, whereupon the testatrix replied, "Sister, you don't know what I have gone through with at home. Of course my husband, he's gone, and Mr. Morris, he cuts down all my fruit trees and takes them up." Witness asked her if she was afraid to tell it, and she replied: "Yes, he come down here, and I am all alone by myself, and they killed a man and his wife at my place and that makes me scared all the time." And witness asked her why,

and she said, "You don't know what I go through with. Mr. Morris bothers me so." She told witness that Mr. Morris scared her.

Another witness stated that he had "seen her act sort of frenzy mind—waiver in her talking," and heard her say the "niggers were trying to work her out of her property." Had seen her cry, and said she didn't have a child to cry for bread, and heard her halloo and tell people to get away from her pecan trees where there was no one about the trees.

Another witness stated that at one time the testatrix had complained of the hoodoo and marked the place where they took the hoodoo out of the fireplace. She paid the negro woman, who lived in Little Rock, $10.00 for taking it out. She said it affected her stomach. She said she thought some negroes living in one of her houses had done it. That was about six years before her death. This witness stated that testatrix had lost a sister in 1907 and that she "liked to have died" when she lost her sister. She stated that she did not have any more hope. She took her sister's death very hard.

The testimony of appellant and several witnesses, among them the physician who attended the testatrix in her last illness, tended to show that the testatrix had mental capacity to make the will; that she was a negress of unusual intelligence and industry, and managed her own property and made money and saved it.

It is unnecessary to set out in detail all this testimony relating to the mental capacity of the testatrix at the time of the execution of the will. Testimony was introduced on behalf of the appellees tending to show her idiosyncrasies and the condition of her mind and body several years prior to and at the time of the making of the will and until she died.

(1) In *Taylor* v. *McClintock*, 87 Ark. 243, 275, it is said: "Hence, it is that, in order to determine the capacity of the testator's mind and its true action at the time the will is made, a wide range of inquiry is

permissible into facts and circumstances, whether before or after the time of making the will, the better to enable the jury to determine the probable state of his mind, and the extent and force of the restraint at the time the will was executed."

In that case we quoted from *Tobin* v. *Jenkins*, 29 Ark. 151, as follows: "The contents of the will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family and connections, their condition and relative situation to him, the terms upon which he stood with them, the claims of particular individuals, the situation of the testator himself and the circumstances under which the will was made, are all proper to be shown to the jury, and often afford important evidence in the decision of the question of the testator's capacity to make the will."

In testing the question as to whether or not the evidence is sufficient to sustain the verdict we must give the testimony its strongest probative force in favor of the appellees, and we have set out enough of it to show that it was a question of fact, under the evidence, as to whether or not the testatrix, at the time of the alleged execution of the will, had sufficient mental capacity to thus dispose of her property.

In *St. Joseph's Convent* v. *Garner*, 66 Ark. 623, witnesses testified that the testatrix whose will was under review in that case was "weak minded," that she "was not bright," that she was "not as intelligent as other girls," etc., and we held (quoting syllabus): "The fact that a testator was of weak mind and not 'bright,' or that she was not as intelligent as the average girl, does not show that she did not have sufficient testamentary capacity to execute a will."

But in the case at bar facts are detailed by the witnesses which made it clearly a question for the jury to say whether or not the testatrix had sufficient mental capacity to make the will. On this issue the court, at the request of the appellees, instructed the jury as follows:

(2) "If you find from the evidence and the circumstances of the case that Elmyra Gatlin, at the time of signing the will, was unable to make a disposition of her property for the want of understanding and reason, the said will is invalid and must be rejected."

And at the request of appellant as follows:

"The court instructs the jury that in order to make a valid will it is necessary that the decedent be of sound mind at the time of making the will; that is to say that she was capable of comprehending her property interests and determining what disposition she desired to make of them, and of making such disposition; that unless you believe from the evidence that Elmyra Gatlin did not have this degree of comprehension, you will find that she was possessed of a sound mind, though you may believe that she did not possess the intellectual vigor of youth, or that usually enjoyed by her while in perfect health."

The appellant criticizes the use of the word "reason" in the above instruction given at the request of appellees, contending that the use of this word is unnecessary and confusing. One of the definitions of the word reason is, "The faculties that enable one to distinguish between the true and the false, in the degree possessed by all sane persons; the normal exercise of the rational faculties." Funk & Wagnall's New Standard Dictionary, word "Reason." It is manifest that the word "reason" is used in this sense in the instruction, and was intended to be synonymous with the word "understanding." While it was unnecessary to use the word *reason*, yet when the connection in which it was used is considered, it could not have confused or misled the jury. Instruction one, for the appellees, and three, given at the request of appellant, while subject to criticism as to their verbiage, were intended to and did substantially conform to the rule announced in *McCulloch* v. *Campbell*, 49 Ark. 367; *St. Joseph's Convent* v. *Garner*, 66 Ark. 623, 628, and *Taylor* v. *McClintock*, 87 Ark. 243, 273.

(3)    There was no specific objection to any particular words in the instruction, and the instruction was not inherently defective, and if appellant conceived that certain words of which he now complains were of doubtful meaning and might be misconstrued by the jury, it was the duty of his counsel to ask the court specifically to explain these words, or else to strike them from the instruction. *St. L., I. M. & S. R. Co.* v. *Barnett*, 65 Ark. 255; *St. L., I. M. & S. R. Co.* v. *Sparks*, 81 Ark. 187, 191, and cases cited; *St. L., I. M. & S. R. Co.* v. *Richardson*, 87 Ark. 602, 607; *Aluminum Co. of N. A.* v. *Ramsey*, 89 Ark. 522, 527.

Appellant contends that there was no evidence to show that the will was executed through undue influence exercised by him over the testatrix. It is the theory of the appellant that the testatrix gave him all of her property, except the $150.00 mentioned in the will which was given to the nieces and nephew of the testatrix, because she was worried a good deal by her husband and by her folks, too.

Appellant's testimony tended to show that she stated to him that she wanted to get her property in condition that they would not get the benefit of it. She wanted to make a will and she gave appellant directions how to dispose of her property, just like they are in the will. Appellant had a lawyer at Little Rock prepare the will. He then showed it to the testatrix. She then came over to appellant's house and said she wanted to sign it up and did not want anybody to know anything about it; didn't want her folks to know anything about it at all. She had stated years before that she wanted to give appellant what she had. Appellant did not care anything about it. It was fixed in that way to satisfy her. Appellant had known the testatrix all of his life. She was his nurse when he was a child and claimed appellant as her boy, and appellant claimed her as his "old black mammy." She stuck to appellant as long as she lived.

It was shown that the value of the property of the testatrix at the time of her death was between $2,000.00

and $2,500.00. The appellant got all of this property, under the will, except the $150.00 specifically bequeathed to her nieces and nephew. Testatrix had an only sister, who was also an aged negress. To this sister the testatrix left nothing. There was some testimony on behalf of appellant tending to show that the testatrix had become estranged from this sister, which appellant contends was the reason why the testatrix disinherited her. But the appellees, on the other hand, contend that this estrangement was brought about through the influence of appellant over the testatrix, and that even if the estrangement afforded a reason for disinheriting this sister, it did not afford any reason why she should leave practically all of her property to the appellant and disinherit them; that they were on terms of closest intimacy and affection with the testatrix.

There was testimony on behalf of the appellees tending to prove that the appellant was a wealthy man, a merchant and planter. The testatrix, at the time of the making of the will, was an aged negress. Before that time and afterwards she was shown to have been afflicted, and to have had strange aberrations. One witness testified that appellant had great influence over her; that once when he was in the city hospital she came to inquire about him. He had that influence over her all the way along.

Another colored witness, a niece of the testatrix, testified that Morris would come to her house with the testatrix. He would sit down in the front room and sometimes talk to her for an hour or longer. "He had much influence over her; never saw her refuse him anything."

Another witness testified that he visited the testatrix often; that she borrowed money on her place and that the appellant had control of the money. She would go to his house at least once or twice a year, and he was at her house every month or so.

It could serve no useful purpose to set out further in detail the evidence bearing on the issue of undue

influence. The court on this issue permitted the testimony to take a wide range. It suffices to say that there was testimony to warrant the court in submitting to the jury the issue as to whether the appellant exercised undue influence over the testatrix in inducing her to make the will in his behalf.

The court, among other instructions, told the jury "that if Morris had acquired such dominion or influence over the testatrix as to prevent the exercise of her own discretion in the making of her will, then the will would not be valid." He further instructed the jury that undue influence "is any means employed upon or with the testatrix which, under the circumstances and conditions by which she was surrounded, she could not well resist and which controlled her volition and acts and induced her to do what otherwise would not have been done;" that "it was not necessary that the mind of the testatrix should have acted under influence brought to bear at the time the will was made, or then employed, but they may be such as have at a previous time been so fixed and impressed as to retain their controlling influence at the time the will was executed, and have been the procuring cause of the execution of the will."

The court told the jury that "it was not necessary that the testatrix's will be restrained by force or intimidation, but that if her mind acted by force of long training to submission, so that the will of another is adopted for her own, and without reflection, then the will was invalid."

In another instruction, No. 6, the court told the jury "that fraud and undue influence are rarely susceptible of direct proof, and such proof is not required; all that is necessary to establish these issues is that there be affirmative evidence of facts and circumstances from which their existence and exercise may be reasonably inferred."

The court further told the jury that "if the will was executed by the artifice, fraud or imposition of

appellant, and that the testatrix was of such weak mind as to be unable to resist him, that the will was invalid."

There was a general objection to the above instructions on behalf of the appellees. And at the request of the appellant the court gave, among other instructions, the following:

That "undue influence which avoids a will is not the influence that springs from natural affection, but such as results from fear, coercion, or any other cause that deprives the testatrix of her free agency in the disposition of her property;" that "if Morris possessed an influence over the testatrix they should not consider it in determining their verdict unless they found that he exercised this influence over her in procuring her to execute the will in his favor, and that said influence so exerted was the procuring cause of her executing said will."

In *McCulloch* v. *Campbell*, *supra*, we said: "The influence which the law condemns is not the legitimate influence which springs from natural affection, but malign influence which results from fear, coercion, or any other cause which deprives the testator of his free agency in the disposition of his property."

(4) The court, at the instance of the appellant himself, correctly defined what is meant by "undue influence" in invalidating a will; that is, such influence as results "from fear, coercion, or other cause that deprives the testatrix of her free agency in the disposition of her property."

(5) When the instructions are taken as a whole, it is evident that the court used the words "artifice," "fraud" or "imposition," in the instructions given at the instance of appellees as synonymous with "undue influence." If there was undue influence brought about by fear or coercion, such undue influence would also be tantamount to a fraud perpetrated upon the testatrix. If appellant desired to have these words stricken from the instruction he should have specifically requested it. Instead of doing so, he asked an instruction which told the jury that undue influence resulting

from fear or coercion, or any other cause, that deprived the testatrix of her free agency would avoid the will. The asking of an instruction to this effect by the appellant himself was equivalent to waiving the objection as to the submission of the issue of artifice, fraud or imposition. The complaint did not, in specific terms, charge that the will was executed through artifice, fraud or imposition. If the appellant had specifically objected to these words being employed, he might have had the same eliminated, but in the absence of such objection, and in view of the instruction asked by him which virtually submitted the issue of fraud, the appellant is in no attitude to complain because the court included these words.

(6) Instruction No. 6, given at the instance of the appellees, was not aptly phrased, but when carefully analyzed it cannot be said that it was an instruction on the weight of the evidence before the jury. The effect of the instructions, taken as a whole, was to tell the jury that fraud and undue influence could be established by circumstantial evidence, and that it was necessary that there be proof of facts and circumstances justifying an inference of fraud and undue influence before the jury were authorized to find that there was such fraud and undue influence. In other words, the jury were not authorized, under the instruction, to presume fraud and undue influence, without proof of same; but they were authorized to find the fact that there was fraud and undue influence upon circumstantial evidence, provided the facts and circumstances were such as to warrant a reasonable inference of fraud.

(7) In *Clough* v. *Clough*, 10 Colo. App. 443, it is said: "A charge of undue influence is substantially that of fraud, and it can seldom be shown by direct and positive evidence. While it is true that it must be proved and not presumed, yet it can be and most generally is proven by evidence of facts and circumstances which as to themselves may admit of little dispute, but which are calculated to establish it and from which

it may reasonably and naturally be inferred." *Black-man* v. *Edsall*, 17 Colo. Appeals, 429, 435; see also *Saunder's Appeal*, 54 Conn. 108, 116; *Effie Hoffman, Ex.* v. *Harris Hoffman, et al.*, 192 Mass. 416, 419; *In re Shephards' Estate*, 161 Mich. 441, 463; *Lindsey* v. *Stephens*, 229 Mo. 600, 618; 40 Cyc. 1164.

The instructions upon the issue of undue influence, upon the whole, were in accord with the principles announced in the above authorities. See especially *Lindsey* v. *Stephens, supra.*

The court, in instruction No. 1, given at the instance of the appellant, told the jury that the burden of proving incapacity and undue influence was upon the appellees, and in instruction No. 5 it told the jury that the testatrix had a right to execute whatever will she may have desired and to make whomsoever she saw fit her beneficiaries. While instructions numbered 6 and 8, on behalf of appellees, are not to be approved as precedents, yet when these are considered in connection with the instruction given at the instance of the appellant, and all the other instructions in the case, it cannot be said that the jury was confused or misled by the instructions. The charge as a whole correctly applied the principles of law to the evidence adduced.

The words "any means employed" in the third instruction given at the request of the appellees should have been met by specific objection. When taken in connection with all the instructions it is manifest that the court meant any means employed that brought the will of the testatrix under the domination of the appellant, causing her to make a will that was not the exercise of her own volition, but was by reason of the undue influence brought to bear upon the testatrix by the appellant. When taken in connection with the other parts of the charge, this language could not have confused or misled the jury.

We find no errors in the rulings of the court in admitting or rejecting testimony. The record upon the whole is free from errors prejudicial to the appellant and the judgment is therefore affirmed.