Peggy Butts MATTHEWS,
Plaintiff-Contestant-Respondent,

v.

Guy E. TURNER,
Defendant-Proponent-Appellant.

No. 10646.

Missouri Court of Appeals,
Southern District,
Division Two.

May 9, 1979.

Nicholas R. Fiorella, Springfield, for plaintiff-contestant-respondent.

Arthur S. Haseltine, Lester B. Cox, Springfield, for defendant-proponent-appellant.

MAUS, Judge.

On February 15, 1972, testatrix Ella C. Butts (Ella) executed her will devising her estate to her brother, proponent Guy E. Turner (Guy). Referring to her only child, her adopted daughter, contestant Peggy Marie Butts Matthews (Peggy), she said, "I expressly acknowledge that I have a daughter, Peggy Marie Matthews, that I have already given certain property to, and that she is not to take under this, my Last Will and Testament." By this action, Peggy contested the will alleging testamentary incapacity and undue influence of Guy. However, the case was submitted solely on the issue of undue influence. A verdict was returned declaring the instrument not to be the Last Will and Testament of Ella C. Butts. Guy appeals asserting as error (1) the absence of a submissible case (emphasizing the absence of a presumption); (2) failure to grant a mistrial in connection with contestant's opening statement and (3) admission in evidence of a 1954 joint will.

■ The record of the three day trial is lengthy. Only a summary of the evidence is possible. In considering the evidence, this court cannot review the record as a jury. Rather, "[W]e must take the contestants' evidence as true, disregard proponents' evidence unless it aids contestants, and give contestants the benefit of every favorable inference which may be drawn from the whole evidence." *Salisbury v. Gardner*, 515 S.W.2d 881, 883 (Mo.App. 1974). Also, *Switzer v. Switzer*, 373 S.W.2d 930 (Mo.1964); *Wilhoit v. Fite*, 341 S.W.2d 806 (Mo.1960).

John W. Butts (John) and Ella C. Butts (Ella) were married in 1921. At a time not revealed by the record, but apparently when she was ten weeks old, John and Ella adopted Peggy who was born in 1926. Peggy did not learn of her adoption until she was 12 years old. She lived with her parents until she married Loren Matthews in 1958. At the time of trial in 1975, Peggy's family consisted of her husband and two daughters, 11 and 13 years of age.

By 1960 both John and Ella were in failing health. Before his death in 1969, John had suffered a stroke, was somewhat feeble and had a poor memory for recent events. In 1947 Ella was initially operated on for cancer of the breast. She remained under medical care and was hospitalized numerous times. Her affliction persisted and ultimately led to her death on November 6, 1973.

John and Ella owned adjoining houses in Springfield. They lived in one and rented the other. In 1960, at her parents' request, Peggy and Loren moved into the rental house so they could provide care for the parents. Before moving, the Matthews, at their own expense, renovated the rental house. From that time until the rift (about which more will be said later) the Matthews provided personal services for the Butts. The need for personal services increased after Ella had a heart attack in 1968. Loren made repairs and improvements to both houses, did the yard work and in general served as the "handy man". Peggy, with some help from her two daughters, provided personal care and housekeeping assistance. She cooked the meals and took her mother such places as to the doctor and grocery shopping. After Ella's heart attack, at her request, Peggy handled her mother's business affairs. In summary, as the proponent said, "she took care of Ella."

Concerning finances in her later years, Ella owned the two houses. She had a modest savings account. Her monthly income consisted of approximately $89 from Social Security, rent of $60 from the Matthews and payments of $50 from the sale of other property. The latter payment terminated before her death, probably in 1972. Loren was employed by the Frisco and during the period in question earned $400 to $600 per month. Peggy was not employed.

There was evidence the Matthews' rent was low as the similar Butts' house, when not occupied by Ella, rented for $115–$125 per month. The Matthews bought several items for the Butts including carpeting, washer, dryer, television, silverware, stainless set and dishes.

In May, 1970, Loren requested a loan from Ella for the purchase of a television. Ella paid $483.35 for the television. She told Loren to forget it and the loan was not paid. Other than the television, Peggy received only the usual Christmas and birthday presents from her parents.

Until the rift, the relationship between the Butts and Matthews was good. There was reciprocal love and affection between Ella and Peggy. Ella loved and was proud of her grandchildren.

There was no evidence of testamentary incapacity. Ella was described as basically a difficult, domineering person. She expected to have things done when she wanted them done. She grew resentful of the time Peggy devoted to her family. As her illness progressed, Ella was said to have suffered a personality change, becoming a very anxious, dependent person. Both Ella and Peggy were said to be quick tempered. There was evidence that over the years, there were frequent quarrels between the two. However, until the rift, their differences were soon forgotten. As proponent testified, basically the arguments between Peggy and Ella were no different than the arguments he had with his children.

On March 10, 1954, John and Ella executed a joint will by which they devised their entire estate to "our beloved and only child, Peggy Marie Butts." After the Matthews moved next door, when she was seriously ill, Ella gave Loren a fully signed copy of this joint will. Neither Peggy nor Loren ever saw the original. It apparently was never found. Over the years, John declared that he built the rental house for Peggy; both John and Ella repeatedly declared their estate would go to Peggy; the rental house would be Peggy's. They expressed satisfaction that there would be a house for each of the grandchildren.

Ella had two brothers who lived in Springfield, the proponent and Charles Turner. Ella was 13 years older than Guy. He declared their relationship to be very close, that she had been like a mother to him. Even prior to the rift, there were frequent visits and contacts between the brothers and the sister. The brothers' relationship with Peggy was said to be cordial.

In July, 1970, Ella suffered what was then thought to be a stroke. She became afraid to be alone. The doctor advised moving Ella to a nursing home. Peggy could not tell her mother she had to move. To provide constant communication, an intercom system was installed between the Butts' and Matthews' houses. This was apparently satisfactory only until the 3rd day when Ella attempted to reach Peggy who had gone to the grocery store.

During the period the system was in operation, Peggy overheard a conversation between Guy and Ella in which Guy said, "I think you ought to put them out of your house, they've lived off of you long enough, why don't you just sell both pieces of property, then you can live some place and really take care of yourself without having to go to a tacky resthome." Guy continued to talk to Ella about getting Peggy out of the rental house, although there would be many times when he saw Ella that he didn't mention Peggy.

Ella did move to first one and then a second nursing home. Guy objected to the second nursing home because of the presence of the proprietress' retarded son. Ella proposed to move to an apartment and Peggy opposed this move. Ella told her to find an apartment or Guy would. An apartment was found and Ella moved to it.

When Ella entered the nursing home, at her request many of her household items were sold. The remaining household items and her personal things were stored in the Matthews' home. Ella's house was rented. In early 1971, when her house became vacant, Ella moved back home. The Matthews supplied some needed household items, including a divan.

In the Fall of 1971, the rift between Ella and Peggy occurred. There was a factual dispute concerning what precipitated and when the rift took place. Guy presented evidence that it occurred on Thanksgiving, 1971, when the Matthews took back their divan and other items while Ella was on a trip to Joplin.

However, in view of the jury verdict we must accept the version of the rift presented by the contestant. Her evidence was that on a Thursday in November, Ella called her and asked to be taken shopping to buy a pantsuit. Peggy said she could not take her as she was involved in school activities. A second call was made on Friday and Peggy said she still could not because of school activities but would do so on Saturday. On Saturday, when she went to get her mother Peggy found she already had the pantsuit. Ella said that Racine (Guy's wife) had taken her, "She's got more time for me than you have; she's not all tied up with P.T.A." Ella added that she thought she would relieve Peggy from looking after her. Peggy said, "Mother, don't be silly." Peggy did take her mother grocery shopping that day. Guy was with Ella that weekend.

The following Monday Ella called and asked Peggy to return her "papers". Peggy urged her to think about it until the next day. That night Ella called and demanded the papers or she would get a court order. Loren delivered the papers. Ella told Peggy that she didn't want to see her anymore.

It was during this period that Peggy had physical problems. Her youngest daughter was also ill. Peggy told her mother that her problem was diagnosed as nerves and she was told she had "a monkey on her back" which she would have to get rid of. Ella became angry and Peggy said that she was acting as if she could be the monkey. Peggy added that she would handle her problems as best she could.

Ella kept calling the Matthews, at times almost daily, demanding items of her personal belongings. Finally, apparently in exasperation, Loren returned all items to Ella. At that time, he took back the loaned furniture, including the divan. At first Peggy could not fix the date of the furniture removal, but later testified that it was in March of 1972. Both Loren and Peggy were positive Ella was home at the time.

After the rift, in November, 1971, Ella asked Guy to take care of her affairs, pay her bills and "do what was necessary with her finances." He did. At least for a period of time Ella continued to sign checks which were written for her by others. Racine from time to time stubbed and balanced the checkbook.

After the rift, Guy and Racine primarily looked after the personal needs of Ella. Ella's health continued to deteriorate. She was hospitalized in May and November of 1972, each time returning to her home. She was again hospitalized in December, 1972, and released to a nursing home, where she remained, except for another period of hospitalization, until her death.

On December 2, 1971, Ella executed a warranty deed placing title to her home in a survivorship estate with Guy. Guy testified he had no knowledge of the deed until after it was executed.

The deed was prepared by an attorney who had acted in that capacity for 12 years for Charles Turner. Neither the attorney nor Charles testified. The attorney's secretary said an appointment was made by Charles Turner, who brought Ella to the office. Charles Turner remained in the outer office while Ella consulted with the attorney. Then, the deed was prepared and executed. The secretary did not remember being paid by Charles or Ella and could find no record of payment. The deed was recorded the day it was executed.

The scrivener of the will was a man who was in the high school graduating class of Guy. They had been acquainted for 40 years. The scrivener principally engaged in the insurance business, although he had been an attorney for 20 years and conducted a limited practice. He wrote insurance for Guy and wrote wills for the Turners.

In January, 1972, Guy was worried about the way one of Ella's insurance policies was written. Ella asked him who she should contact about insurance. Guy suggested the scrivener. At Ella's request he asked the scrivener to contact Ella.

The scrivener said he had never written prior insurance for Ella and was not acquainted with her. At Guy's request, he

did call on Ella concerning insurance. They discussed insurance and he took applications on the two houses. Ella asked if he could draw a will. When he replied that he could, Ella said that she wanted to leave the house next door to her brother as he had been good to her. She said she wanted to exclude her daughter and indicated she had done other things for her daughter. She was not vindictive toward her daughter. On February 15, 1972, the scrivener returned with two business associates as witnesses and the will was executed. The scrivener filled out and Ella signed the check given in payment for the preparation of the will. The will was left with Ella.

Guy testified the day after the will was executed Ella called and asked that he stop by. He and his wife did and Ella gave him the will. Guy first testified he did not know the scrivener was a lawyer. Later, he said maybe he did know. Racine testified that after she returned from Europe in July, 1971, Ella asked who had written their wills. Racine replied, "Mr. Langston did, the same man who made your insurance."

Much evidence was offered concerning the state of Ella's mind and attention paid to her after the rift. At least some affection between Peggy and her mother persisted. At times Peggy continued to cook for her mother. In spite of Ella's statement that she did not want to see her, Peggy visited her mother in the nursing home and hospital. By the time of Ella's death, their relationship had improved although it had not been restored to its previous condition. Ella did spend Christmas 1972 in the Matthews' home.

After this Christmas Ella became ill and through her granddaughter sent for Peggy. Peggy found her mother unable to get up. Peggy asked to call the doctor, but was told she couldn't as Guy was taking care of it. Ella said she just wanted to see Peggy a minute and then urged her to leave as she didn't want Peggy there when Guy arrived.

Within a day or two Peggy saw her mother in the hospital. When Peggy entered the room, Ella cried and said she had something to tell Peggy. Ella said, "I have done something terrible to you; I gave my house to Bud." When Peggy asked how she could do that, Ella said, "I was sick; I was mad; I was just crazy mad; I didn't know." When Peggy suggested that she undo it, Ella said she couldn't as she deeded it to him. When Peggy asked what she had done with the house she was living in, Ella replied, "I haven't done anything with that house."

Mary Aldrich, long time friend of John and Ella visited Ella. Ella related to her the pantsuit incident and forbade Mary Aldrich from seeing Peggy. On a later visit, Ella told her that she had given her home to Guy. When Mary Aldrich said if John knew this he would raise in his grave, Ella said she must have been out of her mind and became somewhat hysterical. John and Ella had discussed their prior joint will with Mary Aldrich but Ella did not mention to her the will in favor of Guy.

Concerning Guy's attitude after the rift toward Peggy, suffice it to say that he did not speak to her again; nor did Charles Turner. Guy did not inform Peggy when Ella was taken to the hospital. He told the funeral director that he and his wife and children and his brother and his wife would sit in the front row at the service. As he said, "I think we have the privilege to sit there."

The proponent asserts the trial court erred in submitting the case to the jury because the contestant did not make a submissible case. He emphasizes her failure to establish a presumption of undue influence.

■ Of course, a submissible case may be made by direct evidence of the exertion of undue influence. However, undue influence may be, and most often is, established by circumstantial evidence. *Davis v. Pitti,* 472 S.W.2d 382 (Mo.1971); *Salisbury v. Gardner,* 515 S.W.2d 881 (Mo.App.1974). "The party who contests the will is entitled to the benefit of all inferences of fact which may be deduced, fairly and reasonably, from the direct evidence. Direct evidence is necessary only to establish the facts from which undue influence may reasonably be

inferred." 3 Bowe-Parker: Page on Wills, Evidence § 29.77, p. 575.

It is not the function of this court to determine the existence of undue influence. Our review is limited to a determination of whether or not the evidence, viewed favorably to the contestant, establishes facts from which the jury could have reasonably inferred undue influence. *Simmons v. Inman,* 471 S.W.2d 203 (Mo.1971).

■ In determining the sufficiency of the facts to permit such an inference the contestant may be aided by a presumption. Such a presumption exists if: (1) a confidential or fiduciary relationship existed between the testatrix and beneficiary; (2) the beneficiary has been given a substantial benefit by the will; and (3) the beneficiary in some way caused or assisted in causing the execution of the will. *Loehr v. Starke,* 332 Mo. 131, 56 S.W.2d 772 (banc 1932); *Simmons v. Inman,* supra, at 206. However, the existence of a presumption is not essential to a submissible case if the circumstantial evidence is otherwise sufficient to permit a reasonable inference of undue influence. *McCormack v. Berking,* 365 Mo. 913, 290 S.W.2d 145 (1956).

■ In this case it is not necessary that we determine whether or not a presumption was established and we do not do so, although by reason of handling her financial affairs Guy undoubtedly occupied a fiduciary position in regard to Ella. *Keller v. Collison,* 395 S.W.2d 729 (Mo.App.1965).

■ It is impossible to set forth a rigid formula of what facts must be established to make a submissible case of undue influence by circumstantial evidence. Factual situations are subject to such a myriad of variations that any one case is of limited precedential value. However, over the years several factors have emerged that are, by the cases and authorities, regarded as highly significant in determining when undue influence may be reasonably inferred. They include factors which tend to establish that undue influence could have been exercised. These are: a testatrix subject to undue influence; a beneficiary with the power to exert undue influence; and a beneficiary with the opportunity to exert undue influence. *Simmons v. Inman,* supra, at 206–207.

They also include factors which tend to establish that undue influence was in fact exerted. Among such factors are the following. An unnatural testamentary disposition. *Simmons v. Inman,* supra, at 206; *Switzer v. Switzer,* 373 S.W.2d 930 (Mo. 1964); *Welch v. Welch,* 354 Mo. 654, 190 S.W.2d 936 (1945). An onset of solicitude of the testatrix by the beneficiary. *Balak v. Susanka,* 182 Mo.App. 458, 168 S.W. 650 (1914). A change in a predetermined testamentary intent. *Simmons v. Inman,* supra, at 207; *Wilhoit v. Fite,* supra, 341 S.W.2d 806. Unusual circumstances surrounding the execution of the will, including activities of the beneficiary even though less than required to raise a presumption. *Schnurbusch v. Bohnert,* 395 S.W.2d 460 (Mo. banc 1965). The actions of the beneficiary in discouraging visits by others or keeping others uninformed about the testatrix. *Gott v. Dennis,* 296 Mo. 66, 246 S.W. 218 (1922). Hostile feelings of the beneficiary toward an expected recipient, 3 Bowe-Parker: Page on Wills, Evidence § 29.83, p. 599, which may be demonstrated by acts before and after the execution of the will. 94 C.J.S. Wills § 250, p. 1121. Remarks of the beneficiary to the testatrix derogatory of the contestant. *Switzer v. Switzer,* supra, at 938. The source of the testatrix's property being such as to make disposition to the beneficiary unlikely. *Bridwell v. Swank,* 84 Mo. 455 (1884). Recitals of the will itself indicative of undue influence. *Norris v. Bristow,* 358 Mo. 1177, 219 S.W.2d 367 (1949).

■ In addition to these factors, when there is independent evidence of undue influence, the declarations of the testatrix may be considered in regard to her state of mind, including her susceptibility to undue influence and her reaction to the influence of others. *Simmons v. Inman,* supra, at 207; *McCormack v. Berking,* supra, at 150; *Norris v. Bristow,* supra, at 369; *Gott v. Dennis,* supra, at 223; *Gordon v. Burris,* 141 Mo. 602, 43 S.W. 642 (1897).

In this case, to one degree or another, there was evidence of each of these factors recognized as an indicia of undue influence. Testatrix had been a domineering person, but her physical dependence and desire for attention caused her to be subject to undue influence through such avenues. Her physical dependence was significant. *Godsy v. Godsy,* 504 S.W.2d 209 (Mo.App. 1973). The testatrix trusted the proponent as a joint owner of her home and with her financial affairs. The jury could find the proponent had the power and opportunity to unduly influence the testatrix.

There was an estrangement between testatrix and her daughter. However, the jury could find the disposition of her estate to proponent to the exclusion of her daughter to be out of all proportion to the incident and an unnatural disposition. Testatrix's long standing intent that her estate go to her daughter changed within three months of the rift. Her home was placed in joint tenancy within a month thereafter.

Following the rift, the proponent saw the testatrix almost every day, as often as three times a day. The proponent did recommend as an insurance agent the scrivener of his will. The testatrix did ask the insurance agent, whom she did not know, if he could write a will. The jury could also consider proponent's ambiguous answer concerning whether or not he knew the agent was a lawyer as well as his wife's indication that the agent wrote the insurance long before the will was written. The proponent did not inform contestant when her mother was hospitalized. His attitude toward the contestant was demonstrated by his continuing reference to her inadequate rent, his failure to speak to her and his instructions to the funeral director. Also for consideration was the fact testatrix's property was derived through her deceased husband, whose testamentary intent was that it should belong to the contestant. The recital in the will that testatrix had given certain property to contestant reflected the attitude of proponent toward the contestant. The declarations of the testatrix indicating she was upset with having signed the deed to her home and was fearful of the proponent

finding that her relationship with her daughter was improving were significant.

A circumstantial case of undue influence is not made by the establishment of any one factor. Rather it is a combination of factors. As a result, it is seldom, if ever, that a case can be found which is "on all fours" with the case at bar. We have carefully considered the cases cited by proponent and they are distinguishable from this case. No one of these facts which are recognized indicia of undue influence would establish a submissible case. Nor would these factors considered together, as they must be, compel a finding of undue influence. That determination must be left to the trier of the facts, in this instance, the jury. Upon two occasions the trial court held that considered as a whole, facts were established from which the jury could reasonably infer undue influence. We hold that no error was made in submitting the case to the jury.

The contestant sought to file an amended petition. The amended petition contained the allegations of testamentary incapacity and undue influence. It sought to add allegations that John and Ella contracted to execute a joint will in the form of the instrument of March 10, 1954, and thereby the will of February 15, 1972, was void. The amended petition was refused.

In a colloquy following the refusal of the amended petition, the proponent requested the court to admonish contestant's counsel not to refer to any alleged agreement or contract. Contestant's counsel then stated he understood the court's ruling to mean there would be no talk of any "legal ramifications of a prior document or that that document in any way legally or lawfully prevented any transfer of property." But, he asserted the document was relevant and there would be evidence of an agreement between John and Ella. The trial court at that point declined to rule on what evidence would be admitted.

Contestant's counsel in his opening statement said there would be evidence that John and Ella near 1954 "contracted togeth-

er" to insure their property would go to contestant. Proponent objected and asked for a mistrial. The trial court understood the reference to mean they executed an instrument and overruled the objection. The court did admonish contestant's counsel not to refer to a joint will as legally binding. Contestant's counsel then continued by referring to the execution of a document in 1954 and he read the dispositive provision of the joint will to the jury. During the trial signatures of John and Ella on the photocopy of the joint will were identified and it was admitted to show Ella's state of mind. Proponent asserts error in the refusal of a mistrial and the admission of the photocopy of the joint will.

 The contestant was properly barred from asserting in her amended petition that the will of February 15, 1972, was void because of the alleged contract to devise. The remedy for the enforcement of such an alleged contract is by an action in the nature of specific performance. *Owens v. Savage,* 518 S.W.2d 192 (Mo.App.1974).

But, this does not mean evidence of a contract to devise is wholly inadmissible in a will contest based upon undue influence.

It is proper to show the existence of a contract on the part of the testator to make a will containing certain provisions. If the will is in accordance with such contract, the existence of the contract will tend to show the absence of undue influence. If the will is inconsistent with such contract, the contract may be used as tending to show that the will was caused by undue influence. 3 Bowe-Parker: Page on Wills, Evidence § 29.109, p. 645.

The trial court had indicated it would rule on the admissibility of evidence as it was offered. It did not err in refusing to grant a mistrial because of counsel's statement about admissible evidence. In fact, the court's admonition may have unduly restricted contestant's presentation of her case.

Proponent complains about the admission of the copy of the joint will because it was a copy and because of the absence of the original it was presumed revoked. Evidence of testatrix's prior testamentary intent was admissible. It is not rendered inadmissible because that intent had been revoked or changed. Indeed, that is the reason for the admission of the prior intent. Such evidence may be in the form of declarations, a formally executed and fully proved original will, a defectively executed instrument, *Thompson v. Ish,* 99 Mo. 160, 12 S.W. 510 (1889); or a copy, *Bennington v. McClintick,* 253 S.W.2d 132 (Mo.1952). A joint will is evidence of a contract to devise. *Wimp v. Collett,* 414 S.W.2d 65 (Mo.1967). The signatures of John and Ella to this dispositive instrument were not questioned. It was properly admitted.

The judgment is affirmed.

BILLINGS, P. J., and HOGAN, J., concur.