Jessie **FOUNTAIN, et al.,**
**Plaintiffs-Respondents,**

v.

Mildred **SCHLANKER, et al.,**
**Defendants-Appellants.**

No. 45533.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 5, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 13, 1983.

Application to Transfer Denied
June 30, 1983.

Robert A. Hampe, St. Louis, Allan D. Jerger, Clayton, for defendants-appellants.

Walter D. McQuie, Jr., Montgomery City, Darryl L. Hicks, Warrenton, Randy C. Morris, Lee's Summit, for plaintiffs-respondents.

PUDLOWSKI, Presiding Judge.

Appellants, proponents of the will of Samuel Humber, appeal from a judgment setting aside his last will and testament. Respondents initiated this will contest by filing in the Warren County Circuit Court their petition alleging that Humber lacked testamentary capacity at the time the purported will was signed and that the 87 year old decedent executed the document on the date of his death because of undue influence. The case was tried without a jury on the issue of decedent's mental capacity. The trial court found that the decedent lacked testamentary capacity at the time of the execution of the document and refused to admit the document to probate as the last will and testament of Samuel Humber. We affirm.

In this opinion, we shall refer to appellants as proponents of the will; the respondents as contestants.

On appeal, the proponents contend that the trial court erred in finding that Samuel Humber lacked testamentary capacity at the time of executing the will because (1) the finding was against the weight of the evidence in that the testimony established a prima facie case of due execution and presumption of capacity, which the contestants failed to rebut; (2) weakness due to age and disease did not render the decedent incompetent; and (3) the decedent had expressed his wishes to his attorney shortly before his death, had given the attorney a handwritten will with identical contents, and had been assured by his attorney that the new will was consistent with his wishes.

The standard for appellate review in a court tried case requires this court to affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Trunko v. Trunko*, 642 S.W.2d 673, 674 (Mo.App.1982). We should set aside a judgment on the grounds that it is against the weight of the evidence with caution and with a firm belief that the judgment is wrong. "Weight of the evidence" means its weight in probative value, not the quantity or amount thereof; the weight of evidence

is not determined by mathematics but depends on its effect in inducing belief. *Goodnight v. Curry,* 618 S.W.2d 278, 279 (Mo.App.1981). Therefore, the credible evidence makes a vast difference in the problems upon appeal whether there was a judgment sustaining the will or one rejecting it. Here, there was a verdict and judgment rejecting the will and the evidence is necessarily viewed favorably to that finding. *Detrich v. Mercantile Trust Co.,* 292 S.W.2d 300, 302 (Mo.1956). In this determination, we must disregard proponents' evidence unless it aids contestants' case and give contestants the benefit of every favorable inference which may be drawn from the whole evidence. *See Carroll v. Knott,* 637 S.W.2d 368, 370 (Mo.App.1982). Further, where there is a conflict in the evidence, the trial court has the prerogative to determine the credibility of the witnesses, accepting or rejecting all, part or none of the testimony. 642 S.W.2d at 674–675. We give deference to the trial court's conclusions. 618 S.W.2d at 279; Rule 73.01(c)(2).

Within this narrow scope of review, we now regard the facts pertinent to disposition of the issues raised by the proponents of the will.

Humber was 87 years old, a widower with no children, and in frail health at the time of his death on May 1, 1979. His wife Bertha had two children, Elmer and Frank Brandhorst, from a prior marriage but Humber never adopted the two stepsons. Sometime after his wife's death in 1977, Humber was diagnosed as suffering from prostate cancer and was first treated by Dr. John R. Hogan, a specialist in internal medicine, in November 1978 for his cancer. Following surgery that November, Humber left the hospital and moved in with Ida Brandhorst, his stepdaughter-in-law, and her son Elmer Brandhorst, Jr., two of the proponents herein. Ida Brandhorst is the widow of Elmer Brandhorst, decedent's stepson.

Humber continued to see Dr. Hogan with check-ups in December and two visits in February 1979, and reentered the hospital in March 1979. During Humber's hospitalization in March, Gerri Hampton (Ida's daughter and Humber's stepgranddaughter) drafted a handwritten document for Humber as his last will and testament which Humber signed. The document was duly witnessed by Reverend Quigley and Charlotte Murray, neither of whom testified at the trial.

Humber, subsequently released from the hospital, returned to the Brandhorst residence. Ida Brandhorst then telephoned Robert Hampe, an attorney, that Humber needed a will written. Prior to her telephone call, the attorney had never had any contact with Ida Brandhorst nor with Humber. On the evening of April 12, 1979, the attorney went to the Brandhorst home, met privately and discussed with Humber the document which Gerri Hampton had prepared. Humber asked that Hampe "make it legal." The attorney testified that he reviewed the document with Humber, discussed the bequests and made no changes in the specific bequests. Hampe added an in terrorem clause, a clause specifying the duties and bond of the executor, and information on the funeral and burial. Between April 12 and April 24, the attorney talked with Humber on the telephone to review the contents of his will. On April 24, 1979, Humber was admitted to St. Mary's Hospital in St. Louis because his general physical condition had deteriorated, resulting in loss of appetite, dehydration and malaise. From the hospital, Humber telephoned Hampe to make arrangements to have the will executed on the afternoon of May 1st.

On May 1st, Lori Smith, secretary to decedent's attorney, Robert Hampe, arrived at the hospital around 3:00 p.m. to execute the newly drafted will for Humber. She testified Humber was awake and propped up in his bed when she arrived that day. Ida and Pansy Brandhorst, decedent's stepgranddaughter-in-law and wife of Elmer Brandhorst, Jr., were also present in the room. Naomi Ward, Pansy Brandhorst's sister-in-law and a patient in the same hospital, joined them later as the third witness to the will.

At trial, Lori Smith, Pansy Brandhorst and Naomi Ward advanced substantially the same account. Lori Smith handed the will towards Humber and told him, "this is your will." Pansy Brandhorst took the will and handed it to Humber, helping him flip the pages as he apparently looked over the will. When he reached the last page, Pansy said, "all the witnesses are here. Are you ready to sign your will?" Humber replied, "Uh huh." Pansy held the document and steadied his arm while he signed the document. Then Lori Smith, Pansy Brandhorst and Naomi Ward signed the will as witnesses. At trial all three witnesses to the will testified they believed Humber to be alert. None testified explicitly that he was of sound and disposing mind when he signed the will. The entire visit, according to the witnesses took approximately a half hour. Some four hours later, between the hours of 7:30 p.m. and 8:30 p.m., Humber died.

■ Proponents of a will have the burden to establish as a part of their prima facie case that at the time of the execution of the will decedent was of sound and disposing mind and memory. *Maurath v. Sickles*, 586 S.W.2d 723, 726 (Mo.App.1979). The prima facie case seems to have been made by the testimony introduced by the proponents. They confrom to the provisions of the law[1] by introducing the three witnesses to the will who testified that Humber signed it in their presence at the hospital, that the three witnesses signed it in his presence, and that they noticed nothing to indicate that his mind was not in good condition or that he was unable to comprehend the nature of his activities. The proponents of the will, however, introduced no medical testimony that decedent was competent at the time it was executed. Nor did any witnesses present at the time the will was executed directly testify that Humber was of sound, disposing mind at that time. Both the handwritten document and the contested will were admitted before the trial court as exhibits.

The contestants introduced evidence that the 87 year old decedent was frail and that his mental and physical vigor had declined dramatically. The debilitating effects of his illness had resulted in a rapid weight loss for his 6'1" frame from about 200 pounds in the fall of 1978 to 121 pounds at the time of his hospital admission on April 24, 1979. Dr. Hogan, Humber's attending physician, entered his diagnosis of uremic poisoning and acidosis caused by the prostate cancer's obstruction of Humber's kidneys. The doctor added that the acidosis, an acid embalance in the bloodstream causes decreased alertness, general weakness, loss of appetite, and, as it progresses, unconsciousness.

The doctor saw Humber every day while Humber was in the hospital. On April 30, in the morning, a nurse had noted "patient has not talked much; alert but very weak and in pain." Around noon time, the doctor described him as "somnolent, hard to arouse but arousable but not really very communicative." At that point, the doctor prescribed Demerol, a pain killer, for the decedent's restlessness to be administered in doses of 25 milligrams every three hours. Sometime later that day, the doctor noted that Humber was "unconscious, quite comatose." The doctor averred "he never regained consciousness until he died the next day," and added that an unconscious person is incompetent.

While the decedent was in the hospital during this period, his visitors included not only the Brandhorsts and the witnesses to the will, but also his sister from California, Winifred Porter, a retired registered nurse; and his niece Mildred Schlanker. Mrs. Schlanker, Humber's niece, had seen him on April 3, prior to his hospitalization. Because he was very emanciated and pale, Mrs. Schlanker called her aunt Mrs. Porter in California and advised her to return to Missouri. Her aunt and she visited Humber daily at the hospital from April 25, 1979, through the 28th. Humber appeared very ill and uncommunicative to her. Mrs. Porter, during the daily visits with her niece to

1. 474.320 RSMo 1978.

see Humber, had occasion to act as the family's spokesperson on April 27. On that day, she gave consent to the doctor that no artificial means be used to prolong Humber's life. Her consent was consistent with instructions Humber had given the doctor upon his admission. Thereafter, Humber received only nursing and supportive care from the hospital staff. Despite her daily visits and a close brother-sister relationship, the decedent was generally noncommunicative with her; on the Sunday before his death, she observed that he was comatose and, based on her medical training, close to death. She corroborated the medical records showing that decedent had lost approximately 50 to 60 pounds from the fall of 1978 when he had last visited her to a weight of approximately 121 pounds, a substantial weight loss for his 6'1" frame. Neither Mrs. Porter nor his niece Mrs. Schlanker saw Humber on May 1, 1979, the day he died.

The medical records and physicians' testimony corroborate the lay witnesses evidence of Humber's non-lucidity, comatose condition, and implicitly, his mental incompetence. The contestants offered substantial evidence from two physicians that Humber was comatose and lacked testamentary capacity as the result of the uremic poisoning and the medication administered to him to palliate his suffering. In addition to the deposition testimony of Dr. John Hogan, the decedent's treating physician, Dr. Thomas Glatter, a full-time faculty member of the University of Missouri-Kansas City School of Medicine and specialist in internal medicine, testified. Familiar with Humber's medical records, Dr. Glatter related the symptoms of uremia or chronic uremic failure, metabolic acidosis, and shock, including their effects on the brain. In response to a hypothetical question predicated on evidence in the record concerning Humber's condition, Dr. Glatter stated his opinion that a person in Humber's condition was incapable of making a reasoned decision, lacked command of his faculties, and was incapable of understanding his actions on the day of his death, the date of the will execution. He based his opinion on numer-

ous factors affecting the decedent during his last days, to wit: acute uremic poisoning, severe kidney failure, metabolic acidosis, cumulative effects of the Demerol, his lack of excretive capability, advanced state of dehydration, cardiovascular collapse ("shock"), his age, drastic weight loss, and medical records showing absence of palpable pulse at 3:00 p.m. on the day of his death, and that nothing (i.e. no mechanical support system) was used in an effort to restore decedent, who lapsed into unconsciousness on the last day or day and a half of his life and just quietly died. He opined that Humber could not have suddenly experienced a lucid moment. The use of narcotics, such as Demerol, coupled with the effects of the acute uremic condition would likely destroy one's mentative abilities, especially where the drug is repetitively administered to an aged, physically frail patient.

Both physicians steadfastly avowed, with reasonable medical certainty, that decedent lacked testamentary capacity on May 1, 1979, thereby distinguishing this case on its facts from Mangan v. Mangan, 554 S.W.2d 418 (Mo.App.1977) and Lindsey v. Stephens, 229 Mo. 600, 129 S.W. 641 (Mo.1910), to which proponents of the will cite. In Mangan, the decedent's doctors were not able to state that the decedent was not lucid; in Lindsey, the court upheld the will where the doctor stated the decedent was clear and lucid. The cases are alike in that the trial court's determination of the will's validity accorded with the testimony of the decedent's physician as to his findings of decedent's mental capacity. Likewise, we are reluctant to disturb the weight the trial court ascribed to the testimony of the physicians in the case at bar.

The proponents rely on the statement of Dr. Hogan that it was possible that decedent could have been aroused. We note in passing that the bare statement that something is possible does not constitute substantial evidence. See Wheaton v. Reiser, 419 S.W.2d 497, 502 (Mo.App.1967). The statement by Dr. Glatter, the non-treating physician, that it was highly improbable,

albeit not impossible, that Humber, given his symptoms, regained sufficient lucidity to execute his will knowingly, elucidates Dr. Hogan's testimony.

The testimony of Humber's sister and niece, contestants' lay witnesses, which we have recapitulated above, conveyed Humber's deteriorated, comatose state. This testimony might not alone be considered sufficient evidence to overthrow a will on the ground of mental incapacity; nevertheless, such evidence may be taken into consideration with other facts in determining whether the decedent is of such mental incapacity. But the testimony and opinion that Humber had uremic poisoning, a serious disease resulting in mental disorder or disorientation as it progresses unchecked, by contestants' two medical witnesses, one of whom had examined, diagnosed and treated Humber; the other, a learned professor and specialist in internal medicine, was sufficient, in our opinion, when considered in conjunction with the testimony of the lay witnesses, from which it could be inferred that the decedent did not have the legal mental capacity to dispose of his property by will at the time the purported will was executed. *Accord, Pickett v. Cooper,* 354 Mo. 910, 192 S.W.2d 412, 415 (Mo.1946). The testimony proves conclusively and substantially the lack of testamentary capacity by the decedent.

Proponents' second point is that age and disease did not render Humber incompetent. Ample evidence not limited to decedent's age and uremia supports the trial court's finding that Humber lacked the requisite testamentary capacity. Contestants' lay and medical witnesses testified inter alia to Humber's lack of communicativeness, drugged state, comatose condition and substantial weight loss, as well as to his advanced age and acute uremia. This point is denied.

Proponents' third point is that the close similarity between the disputed will of May 1979 and a handwritten document of March 1979 which Humber had given his attorney and from which the attorney had prepared the May will demonstrates Humber's testa-

mentary plan or design. The handwritten document was admitted by the trial court solely on the issue of Humber's mental capacity, not his testamentary intent. Both the document and the will were before the trial court as exhibits. Our finding that substantial evidence supports the trial court's decision that Humber lacked testamentary capacity on May 1, 1979, the date of the will's execution, disposes of this issue. This point presents no error. Judgment affirmed.

SMITH and KELLY, JJ., concur.