**Mary Ellen POWELL, Respondent,**

v.

**Julia HICKMAN and Coleman
Hickman, Appellants,**

**and**

**Helen Louise Linhart, Defendant.**

**No. WD 42221.**

Missouri Court of Appeals,
Western District.

July 10, 1990.

R. Edward Murphy, St. Joseph, for appellants.

Jack Peace, Trenton, for respondent.

Before TURNAGE, P.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

This is a will contest action arising under Mo.Rev.Stat. § 473.083 (Cumm.Supp.1989) between two half-sisters, respondent Mary Ellen Powell and appellant Julia Hickman,

who were born to the testatrix, May Merrill. Julia Hickman's husband, Coleman Hickman is a named defendant. A third named respondent, Helen Louise Linhart, did not appeal. A jury found in favor of the plaintiff Mary Ellen Powell who asserts that a 1982 will, not a 1986 will, is the last will and testament of May Merrill. The appellants allege that the trial court erred by: (1) failing to direct a verdict for appellants because respondent did not adduce substantial evidence to contradict appellants' prima facie case on testamentary capacity; and (2) permitting testimony from respondent regarding the deceased's testamentary scheme which was different from the 1986 will. We affirm.

May Merrill, testatrix of the disputed will, was an eighty-eight year old widow at the time of her death on January 2, 1987. The evidence indicated that she was married twice during her lifetime. The testatrix's first marriage was to Roy Collins. She had four children by that marriage: Mary Ellen Powell, LaVeta Sharp, Nadine Garber (deceased) and Chester Collins (deceased). Following the death of Roy Collins, the testatrix married John Merrill in 1927. Only one child, Julia Hickman, was born of this second marriage. At the time of her death, Merrill owned 390 acres of farm real estate, a home, bank deposits, and miscellaneous personal property.

Two wills were known to have been executed by May Merrill during her lifetime. The first will was dated June 25, 1982. The second will, the subject of this lawsuit, was dated December 16, 1986. The 1986 will specifically revoked any and all prior wills. The named legatees and devisees of the 1982 will were as follows: Mary Ellen Powell, Julia Hickman, and LaVeta Sharp, daughters of May Merrill; Roger Sharp, and Rodney Garber, grandsons of May Merrill. Pursuant to the provisions of the 1982 will, LaVeta Sharp and Rodney Garber were each bequeathed the sum of $10.00. No other specific devises or bequests existed in the 1982 will. The residuary estate of Merrill was to be divided in equal one-third shares between Mary Ellen Powell, Julia Hickman, and Roger Sharp. Mary Ellen Powell testified, over appellants' objection, that Merrill had prepared deeds that would divide all 390 acres of her farmland among her heirs.

The named legatees and devisees of the 1986 will were as follows: Mary Ellen Powell; Julia Hickman; LaVeta Sharp; Rodney Garber; and Helen Louise Linhart, a granddaughter of May Merrill who was not mentioned in the 1982 will. Pursuant to the provisions of the 1986 will, Rodney Garber and LaVeta Sharp were each bequeathed the sum of $10.00. In contrast to the 1982 will, the 1986 will provided that two specific tracts of real estate, totalling 120 acres, would go to Mary Ellen Powell, and that three specific tracts of real estate, totalling 270 acres, would go to Julia Hickman. The 1986 will divided the residuary estate in equal one-third shares between Mary Ellen Powell, Julia Hickman, and Helen Louise Linhart. In both Merrill's 1982 and 1986 wills, Coleman Hickman, husband of Julia Hickman, was named as the personal representative of the estate.

From the time of her marriage to John Merrill, May Merrill resided on the Merrill farm located approximately four and one-half miles east of Spickard, Missouri. The Merrill farm adjoined the farm owned by Julia and Coleman Hickman. The residences of the Hickmans and Merrill were approximately one and one-half miles apart. While Mary Ellen Powell had resided in Des Moines, Iowa for the past 30 years, she spent extended periods of time with her mother; from 1984 through 1986, Powell visited from November to April of each year as well as the summer months.

Julia and Coleman Hickman assisted Merrill with her farming operation, which consisted primarily of raising beef cattle. The Hickmans sharecropped some of Merrill's land and assisted her with other farm work. Merrill paid the Hickmans for baling her hay. Evidence existed that the Hickmans received some compensation for other work at Merrill's farm, such as de-

horning calves and the installation and repair of fences. May Merrill lived both alone, and with others, in her house on the Merrill farm from 1947 until September, 1986.

Until the fall of 1986, Merrill had personally taken care of her various bank accounts. She had numerous bank accounts, including certificates of deposit, most of which were held jointly with her daughters. When necessary, Mary Ellen Powell and Julia Hickman assisted their mother with the handling of these accounts. Until September, 1986, Merrill kept a herd of cattle and performed many of the daily farm chores associated with the cattle. She also received assistance from others such as her sister, Bessie Douglass, and Roger Sharp.

On September 15, 1986, May Merrill was hospitalized for chronic heart problems. Upon Merrill's discharge from the hospital on September 26, 1986, Mary Ellen Powell moved in with her on the Merrill farm. On October 10, 1986, Merrill was re-hospitalized for chronic heart problems. Discharged from the hospital on October 15, 1986, Merrill began receiving periodic in-home nursing care from the local hospital. Three in-home nurses periodically examined May Merrill: Janet Vanderpool, Deanna McCarter, and Georgia Shilling.

McCarter saw Merrill in the fall of 1986. She testified as follows: that when she first saw May Merrill, Merrill was very ill; that Merrill could not take care of herself without assistance, and got worse as time went on; she couldn't take her medication without help; if left to her own devices, Merrill would not have been able to feed and take care of herself in a nourishing manner; Merrill could not remember what meals she had previously eaten, or what she had done the day before; and she was confused and disoriented at times. McCarter's notes for the December 4, 1986, visit indicated that Merrill did not want to get better, and "is ready to go on." McCarter tried to get her to talk about her problems but Merrill remained reserved and quiet.

On November 18, 1986, Merrill was re-hospitalized. During this hospitalization she remained restrained in bed in a sitting position. During this hospitalization, Mary Ellen Powell overheard Julia Hickman telling Merrill that the reason Merrill felt so nervous and frightened was that "she had done Julia wrong," and "that if May didn't correct the wrong that Merrill wouldn't enter into the 'pearly gates.'" Testimony adduced at trial indicated that Julia was overbearing and extremely religious.

Julia Hickman failed to notify Mary Ellen Powell that Merrill was dismissed from the hospital on November 26, 1986. Merrill stayed at the Hickman home from November 26, 1986, until a few days before her death. During this time, Merrill was totally dependent on others for her care.

Janet Vanderpool, a home health care nurse who visited Merrill on November 28, 1986, at the Hickman's home, was told by Julia Hickman that Merrill was confused at times. After receiving a call from Julia Hickman, who reported that Merrill was worse, Vanderpool made another visit on December 8, 1986. Hickman told Vanderpool that Merrill said "help me, help me" all the time but that Merrill did not remember why she said it. While at the Hickman home, Vanderpool also heard Merrill say "help me, help me." When Vanderpool asked Merrill what she needed help for, Merrill repeated "help me, help me."

Merrill was totally dependent on the Hickmans for her care. On December 12, 1986, the Hickman's took Merrill to the American Bank in Spickard. At this visit, several of Merrill's accounts were changed. Money from a demand deposit account in the names of both Merrill and Mary Ellen Powell, of between approximately nineteen or twenty thousand dollars, ultimately went into an account for Julia Hickman. Deanna Washburn, a bank employee, prepared a memorandum of this visit for the bank's records, which included Washburn's perception of the events on December 12. She perceived that it was upon Julia Hickman's suggestion that Merrill changed the account and deposited sums totalling $61,-082.64 to Julia's checking account, # 207–819.

On December 15, 1986, Mary Ellen Powell went to the lock box at the American Bank. This lock box had been in both the names of Merrill and Mary Ellen Powell for at least twenty-seven years. The lock box contained abstracts, bank notes, certificates of deposit and a plastic sack with quitclaim deeds in it.

Later, that same day, Julia and Coleman Hickman took Merrill to the bank. Washburn overheard either Julia or Coleman Hickman comment that "Mary Ellen has been in the lock box and let's get this thing closed out." At that time, the lock box was closed out. Also, while Merrill was at the bank with the Hickmans, two certificates of deposit held jointly between Merrill and Roger Sharp, totalling approximately $6,500, were cashed in, with penalty, and put into an account in Merrill's sole name. Merrill also closed out an $8,000 savings account that had been held jointly between Sharp and Merrill, putting the money into an account under her name alone.

Also, on December 15, 1986, Vanderpool saw Merrill. Her notes stated that Merrill had complained of pain all over her body for two days. Merrill appeared confused at times.

On the same day, December 15, Coleman and Julia Hickman took Merrill to the law office of Leroy Miller to prepare a new will. Miller had provided legal assistance to the Hickmans through the years. Merrill told Miller that she wanted to rewrite her will. He met privately with Merrill and her aide, Charlene Coon, to discuss the specific provisions of the will. Miller testified that Merrill discussed each tract of farmland which she owned and the specific relatives who were to receive her property. Miller stated, "I went into detail with Mrs. Merrill what she wanted to change; and she pretty well gave me instructions pretty emphatically as to what she wanted to do." Miller also testified that he discussed with Merrill her various joint bank accounts.

On December 22, 1986, in-home nurse Schilling visited. She testified as follows:

Merrill's condition had worsened; she would hardly answer her name; she was lethargic; slow to respond; and completely bedfast, requiring total care. On December 22, Merrill didn't even recognize that Schilling was a nurse.

On that same day the Hickmans took Merrill to Brookfield, Missouri to be examined by Dr. Zaylor. In a report prepared by Dr. Zaylor, he stated as follows: Merrill would answer simple questions but appeared disoriented and not very alert; she had to be aroused verbally to get her to answer questions and she would refuse to answer but not explain why; Merrill did not appear to be oriented to time, place or circumstance; she did not know what town she was in or where she was; and her immediate recall was impaired. She could not recall three out of three words, even after a few moments. Oftentimes she would answer simply by saying "I don't know" or "I am afraid."

### I.

■ Appellants challenge the trial court's failure to direct a verdict as well as its submission of instruction number seven, verdict director, because there was insufficient evidence to submit on testamentary capacity. However, the appellants failed to object to this instruction and did not raise this issue in their motion for new trial. In *Rhodes v. Chambers*, 759 S.W.2d 398, 412 (Mo.App.1988) the court, *citing, Associates Discount Corporation v. Isgriggs*, 431 S.W.2d 694, 695 (Mo.App.1968), stated:

The appellate court, observing that the allegation of error was not contained in the motion for new trial and the objection was not specifically stated when the instruction was offered, held that point was not preserved for review.

However, we shall examine this issue *ex gratia*.

■ The question raised by appellants is simply whether or not respondent adduced sufficient evidence to submit the issue of testamentary capacity to the jury.

In considering this point, the court's duty on review is to accept the plaintiff's evidence as true and to give the plaintiff the benefit of every inference which may be drawn from the whole evidence, *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo. 1967); *Fountain v. Schlanker*, 651 S.W.2d 594, 596 (Mo.App.1983), and disregard the defendants' evidence except insofar as it aids plaintiff's case. *Stout v. Central Nat. Life Ins. Co.*, 522 S.W.2d 124, 128 (Mo.App. 1975). Here, there was a verdict and judgment rejecting the will, and the evidence is necessarily viewed favorable to the finding. *Detrich v. Mercantile Trust Company*, 292 S.W.2d 300, 302 (Mo.1956); *Fountain v. Schlanker*, 651 S.W.2d at 596. Further, the weight and credibility of the evidence is for the jury. *Lewis v. McCullough*, 413 S.W.2d at 505; *Pickett v. Cooper*, 192 S.W.2d 412, 416 (Mo.1946).

■ There is no dispute that the testatrix had experienced serious health problems in the weeks preceding the preparation and execution of the 1986 will. On September 15, 1986, Merrill was admitted to Wright Memorial Hospital for congestive heart failure, with a secondary diagnosis of mitral insufficiency, hypothryoidism, Parkinsonism, hypomagnesemia and renal failure. At this time, the hospital listed Merrill's height at 5'6" and a weight of 135 pounds. She was dismissed on September 26, 1986.

Merrill was admitted to North Kansas City Hospital on October 10, 1986. Her weight upon admission was 115 pounds. Her diagnosis was arteriosclerotic heart disease with congestive heart failure, aortic stenosis and mitral insufficiency, hypothyroidism, Parkinson's disease, cholelithiasis, diverticulosis and duodenitis. Her discharge medications were Digoxin, Quinidine, Snythroid, K–Tax, Lasix, Artane and Allopurinal. The hospital records indicate that she had been weak, had a clear change in her mentation and her activity tolerance had significantly deteriorated. Merrill was discharged on October 15, 1986.

Merrill's next hospitalization was at Wright Memorial Hospital, with admission on November 18, 1986. She was diagnosed with chronic congestive heart failure, secondary arteriosclerotic heart disease, aortic stenosis and mitral insufficiency, hyponatremia and hypochloremia secondary to diuretic therapy, digitalis intoxication, mild hypothyroidism, Parkinson's disease and cholelithiasis. During this time Merrill was restrained for safety. The hospital records indicate that Merrill was too shaky to feed herself, spoke in disjointed words that did not seem appropriate, and on one occasion had pulled her I.V. out and crawled from her bed to the hallway. A chest restraint was placed on her. When Merrill was asked why she moaned or what troubled her, she stated that she did not know. Her daughter noted her confused mentation during conversation. Merrill's height was noted as 5'4" and her weight ninety-eight pounds. Admission records showed that Merrill was disoriented as to time and place, depressed, drowsy and her speech slurred. Her medications were Lasix, Lanoxin, Allopurinal, Synthroid, Aldacton, Quinidine, Xanax and Trihexyphenidyl. Merrill was discharged on November 26, 1986.

Merrill's final hospitalization was on December 29, 1986, at the North Kansas City Hospital. Hospital records state that Merrill sometimes opened her eyes and looked at the speaker but did not follow commands, was confused, whimpered, restless, refused to open her mouth, appeared disoriented, was unable to reply to questions, and was unable to answer questions appropriately. May Merrill died on January 2, 1987.

Nurse McCarter noted in late October and early November that Merrill got confused at times and forgot recent events; and that Merrill was very ill and could not take care of herself without assistance. She couldn't always remember what she had eaten the meal before, or what she had done the day before. She was confused and disoriented.

On November 28, 1986, Nurse Vanderpool observed that Merrill needed assist-

ance with all of her daily living activities. Merrill went from a period of knowing who Vanderpool was, where she was, and what time it was, to being confused about times and places, and not always recognizing Vanderpool.

Nurse Vanderpool saw Merrill on several occasions in December at Julia Hickman's home. Hickman had called, stating that her mother was worse and that Vanderpool had to visit right away. Vanderpool observed that Merrill said "help me, help me" all the time but did not remember why she said it. Additionally, Vanderpool saw Merrill on December 15, 1986. Merrill had complained of pain all over her body for two days but could not specify any particular area of pain.

Nurse Schilling saw Merrill on several occasions in December and observed the following: Merrill was bed bound, required two assistants to get up, and was totally dependent on someone else for her care. Merrill responded to verbal stimuli, but was very lethargic, and very slow to talk. On December 22, Merrill did not respond even to say whether she was confused or not. She knew who she was, but not where she was.

Finally, respondent introduced the letter of Dr. Charles L. Zaylor, psychiatrist, concerning Merrill's visit with him on December 22, 1986. Just six days after the December 15, 1986, will was executed, Dr. Zaylor noted that Merrill did not appear to be oriented to time, place or circumstance. She did not know what town she was in or where she was, and did not know the day, date or time of day.

The only non-party testimony that supported the contention that Merrill was of sound mind was from Miller, the attorney, and his secretaries, Sara Hargrave and Ruth Shipley, as well as the nurse's aide, Charlene Coon, who was a close personal friend of Julia Hickman. Only these individuals saw Merrill on December 16, 1989; they witnessed the execution of the will.

■ A directed verdict is a drastic action which should only be granted where

the minds of reasonable persons would not differ as to the outcome of the case. *Roberts v. Menorah Medical Center*, 777 S.W.2d 330, 331 (Mo.App.1989). To make a case for a jury on the issue of testamentary capacity, the contestant must show substantial evidence that the testator did not have the mental capacity to make a will. *Hodges v. Hodges*, 692 S.W.2d 361, 366 (Mo.App.1985). We believe that the respondent made such a showing. Considering this standard, and the evidence, the trial court correctly submitted the issue of testamentary capacity to the jury.

The appellants presented an oral motion for directed verdict but failed to file a written motion for directed verdict at the close of respondent's case. The oral directed verdict motion alleges two grounds: (1) failure to adduce evidence as to mental incapacity; and (2) failure to adduce evidence to prove undue influence.

■ After the trial court overruled appellants' motion for directed verdict at the close of respondent's case, appellants chose to present evidence. By presenting evidence, appellants waived any error in denying the motion for directed verdict at the close of respondent's case in chief. *King v. Clifton*, 648 S.W.2d 193, 196 (Mo.App. 1983).

■ Finally, appellants, in their motion for new trial, did not raise any question of error with respect to the submission of the issue of undue influence in the execution of the disputed will. At most, they made vague and general references to the denial, by the trial court, of their oral motion for directed verdict at the close of respondent's evidence and at the close of all the evidence. Hence, the trial court had no opportunity to review any alleged error as submitted in appellants' point II. The issue is raised for the first time on this appeal. Supreme Court Rule 84.13(a) clearly provides that allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury-tried case. Since no allegation

of error was presented to the trial court in appellants' motion for new trial, no such error has been preserved for appellate review. *Songer v. Brittain*, 272 S.W.2d 16, 22 (Mo.App.1954). However, we shall review this issue *ex gratia*.

Mo.Rev.Stat. § 474.320 (1986), requires that a will be signed by the testator or by some other person, by testator's direction and in his presence. There was substantial evidence to submit the issue of undue influence. An examination of the December 16, 1986, will showed that Merrill's signature was hardly more than a scribble. Undisputed evidence demonstrated that appellant Julia Hickman held Merrill's hand while she signed the will. Further, no evidence existed that Merrill requested Julia Hickman to assist her in the signing of the will or requested her to sign the will at her direction. In fact, the evidence showed that it was not Merrill, but rather Miller who requested the assistance. Under direct examination Miller testified that Merrill was very shaky and "Sara and I decided that maybe she needed help." Given Merrill's health immediately preceding this event as well as her health immediately thereafter, there is no reason to believe she possessed a sound mind at the execution of the 1986 will.

Testimony adduced at trial showed that Julia was aggressive with Merrill as well as forceful concerning her personal ideas and religion; that Julia and Coleman Hickman told Merrill that "she had to do it their way or it was not the Lord's way." If Merrill failed to follow the Hickman's directions, Julia Hickman would become angry. Bessie Douglas, Merrill's sister, testified that everything Julia Hickman wanted, Julia got from Merrill. Given the fragile physical and mental condition that May Merrill was in immediately before and after the signing of the December 16, 1986 will, there is reason to believe she was unduly influenced.

Further, the jury considered the testimony of Sara Hargrave who stated that she always witnessed any will that Miller had asked her to witness. Every time that Miller had told Hargrave to witness a will, she had done so.

Given the hospital records, the observations of the in-home nurses, and the bank records, we believe there was sufficient evidence to present the question of undue influence to the jury.

## II.

Appellants' final claim of error is that Mary Ellen Powell was allowed to testify, over appellants' objection, concerning the content of certain deeds to farm land. The problem with this claim of error, however, is that appellants did not properly object and failed to obtain a ruling on their objection. The following took place.

\* \* \* \* \* \*

Q. And—if you know, how did those deeds divide up the and?

MR. VALBRACHT: Your Honor, I'm going to object to her testifying as to the deeds. Of course, they are the best evidence as to what they are and apparently she doesn't have the deeds and I don't know how—I don't think she is competent to testify to that, Your Honor.

THE COURT: Well, if she understood the description and—

As can be seen, no specific ruling on the objection was made by the trial court. It is the responsibility of the objecting party to insure that the trial judge has heard and ruled on the objection and if this is not done, nothing is preserved for review. *Reed v. Spencer*, 758 S.W.2d 736, 738–39 (Mo.App.1988). Further, the burden is on the party raising an objection to insist on a ruling. Should counsel fail to do so, it is assumed that the objection has been overruled and the evidence is in the record for consideration. *Sykes v. Bi–State Development*, 716 S.W.2d 856, 858 (Mo.App.1986); *Welch v. Welch*, 633 S.W.2d 447, 450 (Mo. App.1982).

Defendants made no further objections to any other evidence concerning

these deeds. In particular, there were no objections to the following questions and answers:

Q. Did you and your mom talk about these farms in reference to names such as that?

A. Well, the part of the farm I was to get was her pasture land and her— small meadow north of the house, but she was converting that to pasture land. Because her fences were so bad and she just kept the fences up on the outside.

\* \* \* \* \* \*

Q. Okay, and what was your understanding of the names of these places?

A. Okay, the 40 acres where Bessie lived was for me.

Q. Does that have a name? Is that just called Bessie's 40?

A. That's all I ever heard mom call it.

Q. All right. But it wasn't really Bessie's 40, it was in your mother's name?

A. No, it was just where Bessie lived.

Q. All right. And what is the other names?

A. Well, the Tharp place. There was 80 acres that was to be for me. And the 40, the meadow, south of the road was to be for Julia. And then the 120 acre home place was to be for me. The 30 acres over by Spickard was to be for Roger. The 80 acres, the Colors [sic] 80, was to be for Julia.

\* \* \* \* \* \*

Q. And were you with your mother when you went to the lock box to put those deeds and the '82 will in there?

A. No, I wasn't with her. I was—I went back to Des Moines. I was working nights then. No, I was on vacation at the time. The first time was—she took them to the lock box and I was working nights. She went to the bank with them and came out without them. And the second time, she took— brought them home. She was very tired....

It is held that a party to an action will not be heard to complain of the admission of testimony over his objection, where testimony of the same tenor has been admitted without objection. *Sullivan v. Union Electric Light & Power*, 56 S.W.2d 97, 104 (Mo.1932). Consequently, no error has been preserved for appellate review. Supreme Court Rule 84.13(a).

■ Appellant's claim of error is that there should have been no evidence regarding Merrill's 1982 disposition of property. It is certainly relevant and material to present evidence to show how a decedent's disposition of property is changed just a few days prior to her death, as compared to the disposition of property prepared some time before, at a time when there is no dispute about the mental or physical health. It should be noted that appellants had the probate clerk identify appellants' exhibit two, the 1982 will, and that it was introduced into evidence without objection.

The appellants' reliance upon *Earney v. Clay* 462 S.W.2d 672, 676 (Mo.1971), is misplaced. In fact, *Earney* permits declarations of the testator to show mental capacity before, at the time of, and subsequent to the execution of the will. However, these declarations are not admissible for the truth of the facts stated therein.

In *Matthews v. Turner*, 581 S.W.2d 466 (Mo.App.1979), testimony regarding decedent's prior deeds, joint wills, and contracts was introduced into evidence. The court stated:

Proponent complains about the admission of the copy of the joint will because it was a copy and because of the absence of the original it was presumed revoked. Evidence of testatrix's prior testamentary intent was admissible. It is not rendered inadmissible because that intent had been revoked or changed. Indeed, that is the reason for the admission of the prior intent. Such evidence may be in the form of declaration, a formally executed and fully proved original will, a defectively executed instrument; ... or a copy.

*Id.* at 474. Mary Ellen Powell's testimony was relevant and proper and the trial court committed no error.

The judgment of the trial court is affirmed.

All concur.